STATE of Tennessee, Plaintiff–Appellee,

v.

Victor James CAZES, Defendant–
Appellant.

Supreme Court of Tennessee,
at Jackson.

Feb. 14, 1994.

Rehearing Denied April 4, 1994.

James V. Ball, Dwight Duncan, Memphis, for defendant-appellant.

Charles W. Burson, Atty. Gen. and Reporter, Merrilyn Feirman, Asst. Atty. Gen., Nashville, James C. Beasley, Jr., Asst. Dist. Atty. Gen., Memphis, for plaintiff-appellee.

## OPINION

ANDERSON, Judge.

In this capital case, the defendant, Victor James Cazes, was convicted of first-degree felony murder in the perpetration of a rape, aggravated rape, and first-degree burglary. In the sentencing hearing, the jury found

three aggravating circumstances: (1) that the defendant was previously convicted of one or more violent felonies; (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) that the murder was committed while the defendant was engaged in committing a felony. Tenn.Code Ann. § 39–2–203(i)(2), (5), and (7) (1982).[1] The jury found that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances and sentenced the defendant to death by electrocution. The defendant was also sentenced to twenty-five years and six years, respectively, for the aggravated rape and first-degree burglary.

On appeal, the defendant raises numerous issues for our review which involve alleged errors occurring during both the guilt and sentencing phases of trial. We have carefully considered the defendant's contentions as to errors occurring during the guilt phase and have decided that none have merit. We therefore, affirm the defendant's convictions.

As to the alleged errors occurring during the sentencing phase, we conclude that only one has merit—that application of the aggravating circumstance set forth in Tenn.Code Ann. § 39–2–203(i)(7), the murder occurred while the defendant was engaged in committing a felony, is invalid. That is so because it essentially duplicates the elements of the offense of first-degree felony murder and does not narrow the population of death-eligible felony murder defendants, as required of an aggravating circumstance under the Tennessee and United States Constitutions.[2]

After carefully reviewing the record, however, we conclude that the submission of the invalid felony murder aggravating circumstance for jury consideration in this case is harmless error beyond a reasonable doubt. We, therefore, affirm the defendant's sentence of death.

## FACTUAL BACKGROUND

The State's proof introduced at the guilt phase of trial demonstrated that on Sunday morning, April 24, 1988, the body of Gladys Skinner, an older woman[3] who lived alone, was found in her home in the Frayser area of Memphis. She had last been seen alive late Saturday night by Ben Harris, a friend who brought her home from a card game. After checking Ms. Skinner's house to make sure everything was "safe and secure," Harris left around 12:10 a.m.

The next morning, because her telephone was busy each time they called, Gladys Skinner's daughter and grandson went to her house to check on her. When they arrived, they noticed that a front window screen had been removed, that the window was broken, that blood was on the window blinds, and that the doors to the house were locked. The grandson and a neighbor entered the house through the front window and found Gladys Skinner's body lying beneath some bedcovers on the bedroom floor, between the bed and the wall. The wall next to the bed was spattered with blood as were several pictures from the wall that lay broken on the floor. Blood also stained the floor and the fitted sheet on the bed. While the bedroom had been ransacked, nothing of value was missing from the house.

1. Tenn.Code Ann. § 39–2–203(i) [now Tenn.Code Ann. § 39–13–204(i) (1991)]—No death penalty shall be imposed but upon a unanimous finding, as heretofore indicated, of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:

 (2) The defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person;

 (5) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;

 (7) The murder was committed while the defendant was engaged in committing, or was

an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb....

2. See *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992).

3. In opening statements, the prosecutor indicated that Ms. Skinner was sixty-eight years old, but the record does not otherwise reflect her exact age.

Gladys Skinner's nude body was lying face down, her knees underneath her with her buttocks "jacked up off the floor" and her legs spread apart. Scrape marks were found on her inner legs and vagina. Her right breast had been bitten and her left breast was scraped. Dilation of the vagina and rectum demonstrated penetration at or after the time of death; however, no sperm were found. Numerous marks and bruises were found on her body, including defensive wounds to her arms and hands, and a large bruise on her back that the proof indicated could have been caused by a fist.

The Shelby County medical examiner testified that the victim's death was caused by skull injuries that were inflicted by multiple blows to the head with a blunt instrument, like a welder's chipping hammer. According to the medical examiner and a forensic anthropologist who examined the skull, the number of blows had ranged from eight to fifteen and the skull had been "virtually shattered" by the force of the blows. Their proof showed that one or more of these injuries would have caused death within minutes to an hour, but the victim would not necessarily have lost consciousness immediately. A forensic serologist's testimony indicated that the assault may have continued for some time. The serologist testified that some blows may have been struck after the blood from some of the wounds had begun clotting, and that it takes three to fifteen minutes for blood to clot outside the body.

At the time of the murder, the defendant, Victor Cazes, a welder, worked sporadically as a handyman at an automotive repair garage owned by Michael Lucas, Gladys Skinner's step-grandchild. Before the murder, Cazes had been to Gladys Skinner's house two or three times to work on her car. On Saturday night, April 23, 1988, Cazes attended a birthday cookout at Lucas's home, which was a few blocks from Skinner's house. He left the gathering alone around 10 or 11 p.m.

Circumstantial evidence tied the defendant, Victor Cazes, to the offense. His finger and palm prints were found on the front window screen and frame. Two of his fingerprints were lifted from a light bulb beside the back door and fresh pry marks were found on the backdoor. Gladys Skinner routinely left this back light on at night, and it was on when Ben Harris left her house shortly after midnight Sunday morning. When her body was found, the light was off and the bulb was loose in its socket, as if it had been unscrewed.

Michael Lucas testified that Victor Cazes owned two or three chipping hammers, which Lucas described as blunt instruments made entirely of steel with a point on one end, a chisel flat on the other end, and a coil-wired handle. A forensic anthropologist testified that a pattern of depressions located in the involved portion of the victim's skull were consistent with ridges on the striking surface of a particular welder's chipping hammer owned by Cazes. The hammer had been crafted into a metal knick-knack by Cazes after the crime and given to a friend's mother. The forensic serologist also testified that a transfer blood stain on the victim's bedsheet was caused by contact with a wet, bloody object which was consistent with the size and shape of this same chipping hammer and another like it that Cazes had left at the home of his friend's mother.

Dr. Richard Souviron, a forensic odontologist, testified that, based upon his comparison of the bite marks on Gladys Skinner's breast with molds and models of Cazes' teeth, he had concluded to a reasonable degree of dental certainty that Cazes' teeth had made the bite marks on the victim's body at or about the time of her death. Another forensic odontologist, Dr. Harry Mincer, testified that the defendant Cazes could have made the bite marks on the victim. Two women who had engaged in sexual intercourse with Cazes testified that he had also bitten them, and that the victim's body position was one he preferred during sex.

The defendant presented no proof.

Based on this evidence in the guilt phase, the jury found the defendant, Victor Cazes, guilty of first-degree felony murder in the perpetration of a rape, and also guilty of aggravated rape and first-degree burglary.

In the sentencing phase of the trial, the State relied upon the evidence presented during the guilt phase and also introduced

records of the defendant's previous convictions in Shelby County, Tennessee, in February 1990 for "assault to murder first degree with bodily injury" and for aggravated rape.

In mitigation, the defendant introduced medical records from the period of his incarceration in the Shelby County Jail to show that he had required medical treatment on several occasions as a result of fights, and that he had been placed on suicide watch twice while incarcerated. An acquaintance testified that the defendant was a heavy user of alcohol, marijuana and cocaine, and that he sometimes could not remember what he had done while he was intoxicated.

The defendant and two of his brothers testified about his background. One of twelve children, the defendant had been unable to control his urination until he was twenty. He testified that his father had beaten him when he was young. One brother described the defendant as "hot-tempered" and "always fighting." The defendant said that he fought because other people would tease him when he wet on himself. In the seventh grade, after being arrested for truancy, the defendant set fire to his jail cell. He underwent a psychiatric examination and was sent to reform school, where the fights continued. After his release from reform school, the defendant married twice. He has one child from his second marriage. The defendant had worked for a substantial wage as a welder in Louisiana, and a brother described him as a "hard-working man." The defendant testified he began drinking after his first divorce and admitted using various drugs and flying into rages.

As to the crime itself, the defendant testified that on Saturday night, April 23, 1988, he was "full of it" and "well on [his] way" to being drunk when he left the cookout at Michael Lucas's home. After leaving the cookout, he drank a bottle of Jim Bean on his way to a bar where he "got totally drunk." He stated that he remembered nothing more about the night.

Dr. Wyatt Nichols, a clinical psychologist, testified that while the defendant was competent to stand trial and not legally insane, there were signs to indicate psychological problems. Dr. Nichols specifically mentioned the defendant's long history of chemical dependency and multiple drug abuse. He also suggested that the defendant might have an impulse control problem which, along with the history of bedwetting, was possibly indicative of minimal neurological damage.

Based on the proof, the jury found the existence of three aggravating circumstances beyond a reasonable doubt, which were: (1) that the defendant had been previously convicted of violent felony offenses; (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) that the murder was committed while the defendant was engaged in committing a felony. Tenn.Code Ann. § 39–2–203(i)(2), (5), and (7) (1982). In addition, the jury found that the mitigating circumstances were not sufficiently substantial to outweigh the aggravating circumstances and as a result, sentenced the defendant to death.

## PART I.

## GUILT PHASE—TRIAL ERRORS

### A. Sufficiency of the Proof

The defendant first argues that the evidence is insufficient to support the jury's verdict of rape and therefore, insufficient to support a verdict of murder during the perpetration of rape, because the victim was dead at the time of penetration.

It is well-established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the state, and removes the presumption of innocence. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn.1992). Where the sufficiency of the convicting evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Tennessee Rule of Appellate Procedure 13(e); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The medical examiner testified that the dilation of the vagina and anus indicated that

penetration occurred at the time of death, within a matter of minutes of death, or shortly after death.

This Court, in *State v. Brobeck*, 751 S.W.2d 828, 830–832 (Tenn.1988), held that a defendant is guilty of aggravated rape when the proof shows that, through use of force or coercion with a weapon, unlawful sexual penetration occurs at the time of death or shortly thereafter. Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the elements of the rape beyond a reasonable doubt.

We also find the evidence sufficient to establish murder in the perpetration of a rape. A conviction may be based entirely on circumstantial evidence "where facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone.'" *State v. Howell*, 868 S.W.2d 238, 253 (Tenn.1993). Here, the facts established by circumstantial evidence unerringly point the finger of guilt at the defendant alone.

### B. Impartiality of Trial Judge

The defendant next insists that the trial judge displayed hostility and bias against him and his counsel as well as an indifference to the heightened standards of due process applicable in a capital case.

■ It is well-established that a trial judge has broad discretion in controlling the course and conduct of the trial, and that in exercising that discretion, he or she must be careful not to express any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial. *State v. Caughron*, 855 S.W.2d 526, 536 (Tenn.1993).

■ As an example of the trial judge's alleged bias, Cazes points to occasions during voir dire when the trial judge refused to allow his counsel to approach the bench, refused to allow defense counsel to ask a question previously asked on voir dire, and instructed defense counsel not to address a prospective juror by her first name.

Initially, the record demonstrates that the trial judge did not allow either the prosecu-tion or the defense to approach the bench routinely, or to ask repetitive questions of prospective jurors. Moreover, instructing defense counsel to refrain from calling a prospective juror by her first name was entirely proper. The record shows no bias was shown against the defendant or his counsel by the trial judge.

■ Finally, the record does not support the defendant's claim that the trial judge did not appreciate the heightened due process applicable in capital cases. As examples of judicial insensitivity, the defendant points to occasions when the trial judge admonished defense counsel that all trials were the same, capital or otherwise, and require that an attorney be prepared to go to trial on the appropriate date, and that "press of business" is not a good cause for granting a continuance. In another setting the statement that a capital trial is no different from a misdemeanor trial is surely insensitive and inaccurate, in view of the heightened reliability required and the gravity of the ultimate penalty in capital cases. Taken in the context used, however, these and other comments by the trial judge do not demonstrate a mindset so indifferent to the requirements of the Eighth Amendment as to deny the defendant a fair trial.

### C. Motion for Continuance

■ The defendant charges that the trial court erred by denying his motions for a continuance and request for expert services.

The history of defendant's representation shows that the Shelby County Public Defender's Office was originally appointed to represent him in November 1989. A trial date was first set for February 1990, but at the defendant's request, the case was continued and then reset and continued several times thereafter. On July 9, 1990, after serious conflicts developed between the defendant and his public defender attorney, the trial judge appointed two private attorneys. The public defender's office provided its files to the newly appointed attorneys, and by agreement the trial was set for September 10, 1990.

Twelve days before trial the defendant filed a motion for a continuance and for advance expenses to hire fingerprint, pathological and dental experts to "attempt to counter" the State's expert proof, and to employ an expert to investigate whether the pretrial publicity justified a change of venue. The trial court denied the motion because of the length of time the case had been pending and because the defendant had not complied with Supreme Court Rule 13, § 2(B)(10), which requires specific information as to the prospective expert's name, examination date, place, and cost.

The judge, however, with the agreement of counsel continued the trial another two weeks to September 24, 1990. On Wednesday, September 19, the defendant filed a motion to set an ex parte hearing to determine the necessity of investigative or expert services under Tenn.Code Ann. § 40–14–207(b), and for a continuance to retain and utilize any experts approved. The record reflects that the trial judge informed defendant's counsel over his objection that the ex parte hearing would be held the next day, Thursday, with the trial set to begin on the following Monday. At the ex parte hearing, the defendant renewed his request for fingerprint, dental and pathology experts and for the first time requested psychiatric, psychological or neurological experts. Defense counsel explained that the delay in the request for new experts was a result of the need to interview persons in Louisiana, defendant's initial unwillingness to open up to counsel, and counsel's busy schedule.

No evidence was presented at the ex parte hearing to demonstrate the need for these experts, except a statement by counsel indicating the possibility that the defendant had been molested while in jail on truancy charges. The trial court denied the motion on the grounds that numerous prior continuances had been granted at the defendant's request, and because defendant had not complied with Supreme Court Rule 13, § 2(B)(10).

■ We observe that the decision to grant or deny a motion for continuance rests within the sound discretion of the trial judge and will only be reversed upon a clear showing of abuse of that discretion and prejudice inuring to the accused as a direct result of the court's ruling. *Caughron*, 855 S.W.2d at 534; *State v. Melson*, 638 S.W.2d 342, 359 (Tenn.1982). Likewise, the determination of whether provision of expert services to an indigent capital defendant is necessary to ensure that the constitutional rights of the defendant are properly protected is entrusted to the discretion of the trial court. Tenn.Code Ann. § 40–14–207(b) (1990 & Supp.1992).

As to the motion for a continuance, the defendant has failed to show an abuse of discretion. The public defender's office had been handling the case thirteen months when present counsel was appointed. Many continuances had already been granted at the defendant's request. Out-of-state witnesses were scheduled to testify on behalf of the State and arrangements had already been made to accommodate these witnesses. We conclude that the trial court was acting within its broad discretion in denying the defendant's motion for a continuance.

Moreover, the trial court did not abuse its discretion in denying the defendant's request for expert services. Although compliance with Supreme Court Rule 13 is not mandatory when a defendant makes a specific showing at the ex parte hearing that expert services are necessary to protect an indigent defendant's constitutional rights, there was no such showing made by the defendant here. The defendant's request for expert services was accompanied by little more than undeveloped assertions that the services were needed to attempt to counter the State's proof, and by the possibility that the defendant had been molested as a juvenile while in jail and needed further evaluation. *See Caldwell v. State*, 443 So.2d 806, 812 (1983); *see also Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (When an indigent defendant demonstrates to the trial judge that his mental condition will be a significant issue in either the guilt or penalty phase of a capital trial, the State must provide the defendant access to one competent psychiatrist).[4]

**4.** Likewise without merit is the defendant's claim

that the denial of expert services precluded him

#### D. Individual Sequestered Voir Dire

The defendant next faults the trial court for not granting individual sequestered voir dire of the jury panel on both pretrial publicity and the death penalty. He also insists that the trial court's failure to allow him to question prospective jurors about their attitudes towards capital punishment impaired his right to intelligently exercise peremptory challenges.

■ The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court. *Howell,* 868 S.W.2d at 247.

■ Where the crime is highly publicized, the better procedure is to grant the defendant individual, sequestered voir dire, but it is only where there is a "significant possibility" that a juror has been exposed to potentially prejudicial material that individual voir dire is mandated. *Harris,* 839 S.W.2d at 65; *State v. Porterfield,* 746 S.W.2d 441, 447 (Tenn.1988). Likewise, questions regarding the content of any publicity to which jurors have been exposed may be helpful in assessing whether a juror is impartial. However, such questions are not constitutionally required, and a trial court's failure to ask such questions is not reversible error unless the defendant's trial is thereby rendered fundamentally unfair. *Mu'Min v. Virginia,* 500 U.S. 415, ——, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493 (1991).

■ There is no indication in this record that the trial court abused its discretion in denying individual, sequestered voir dire of prospective juror exposure to pretrial publicity. Of the prospective jurors examined, approximately twenty-five percent had been exposed to some pretrial publicity about this case, including two of the jurors who heard the case, and one alternate. However, those jurors stated that they could and would render an impartial verdict based solely on the evidence presented at trial. A trial court's findings of juror impartiality may be over-

turned only for "manifest error." *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984). There is no such error in this record.

■ Moreover, we find no reversible error in the trial court's refusal to sequester jurors for questions about the death penalty. The record shows that the defendant was allowed to voir dire jurors individually as to their attitude about the death penalty. The defendant has not established that the failure to sequester defeated the impartiality of the jury, nor that any juror was exposed to potentially prejudicial information. *State v. Smith,* 857 S.W.2d 1, 20 (Tenn.1993); *Porterfield,* 746 S.W.2d at 447.

#### E. Admission of Evidence

■ The defendant next complains that the trial court erred in several respects in admitting certain evidence at trial. First, he contends that Ben Harris's testimony with respect to the victim's grandchildren's photographs and the victim's personality, character, and family was inadmissible as victim impact proof. The defendant did not contemporaneously object to this testimony.

Had there been an objection, the testimony complained of was still admissible because it occurred in the guilt phase of the proceedings, was relevant background evidence, and established the identity of the bedroom wall photographs later offered as evidence. *Cf. State v. Miller,* 771 S.W.2d 401, 403 (Tenn.1989). We find this issue without merit.

■ The defendant next argues that post-mortem photographs of the victim were improperly admitted because their prejudicial effect substantially outweighed their probative value. Specifically, the defendant points to separate photographs showing the victim's head injuries, breast bite marks, her body position at the scene, defensive wounds on her arms, and the dilation of the vagina and anus. We are guided by the rule that a trial court's decision regarding the admissibility of photographs will not be reversed on

from presenting mitigating proof in violation of the Eighth Amendment. The defendant had a psychologist testify on his behalf, and no one

knew better than the defendant, who also testified, whether he had been molested while in jail and the effect it had on him.

appeal absent a clear showing of an abuse of discretion. *Harris*, 839 S.W.2d at 73.

■ At the guilt phase, the photographs were relevant to the issues of the identity of the perpetrator and the cause of death, as well as necessary to illustrate the testimony of many of the State's experts. At sentencing, the photographs were relevant to establish the especially heinous, atrocious or cruel aggravating circumstance. A photograph showing how the victim's skull was crushed, which illustrated the massive force used against the victim, was properly introduced on that issue at sentencing as well. *State v. McNish*, 727 S.W.2d 490, 494–95 (Tenn.1987). Although the photographs were graphic in some respects, their probative value was not substantially outweighed by the prejudicial effect. Accordingly, we conclude that the photographs were properly admitted pursuant to Tennessee Rule of Evidence 403 and *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978).

■ The defendant next argues, on the same grounds, that the trial court abused its discretion in admitting into evidence the victim's cleaned and reconstructed skull. The skull was used to illustrate the testimony of the forensic anthropologist who had reconstructed it, as he explained the injuries and how he had found a "signature" for the murder weapon. The cleaned, reconstructed skull was highly relevant in establishing identity. The issue is without merit. *See State v. Morris*, 641 S.W.2d 883, 888 (Tenn.1982).

■ Equally without merit is the defendant's contention that the testimony of his two previous sexual partners about his propensity to bite his partner during sex was inadmissible. This evidence was relevant to establish the identity of the person who had raped and murdered the victim, and its probative value was not substantially outweighed by its prejudicial effect. *Banks*, 564 S.W.2d at 949; Tenn.R.Evid. 403 and 406.

■ Finally, the defendant objected to the admissibility of the expert testimony— namely, the testimony of the forensic serologist concerning the pattern of the blood spatterings in the bedroom; the proof of the forensic anthropologist concerning the number of blows and type of murder weapon; and the testimony of Dr. Souviron, the forensic odontologist, matching the bite marks on the victim with the defendant's dental patterns. The defendant argues that the testimony of the serologist and anthropologist was speculative, and that the science of comparing bite mark patterns has not advanced to the level of certainty that is characteristic of fingerprinting.

The admissibility of expert testimony, its relevancy and competency are matters resting within the sound discretion of the trial court. Such testimony is often speculative to some degree. The jury was properly instructed on the speculative nature of expert proof. The lack of absolute certainty in the testimony of these witnesses, all three of whom were qualified as experts in their individual fields without objection by the defendant, did not preclude their testifying. *See Harris*, 839 S.W.2d at 69–70.

### PART II.

### SENTENCING

#### A. Caldwell Error

■ The defendant argues that several remarks by the prosecutor during voir dire, opening statement, and closing argument at the sentencing phase of the trial violated the principles of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In reviewing an alleged *Caldwell* violation, this Court must first determine whether the prosecutor's comments to the jury were such that they would minimize the jury's role and sense of responsibility for determining the appropriateness of death as a sentence and, if so, whether the trial judge sufficiently corrected the impression left by the prosecutor. *State v. West*, 767 S.W.2d 387, 399 (Tenn.1989).

■ We have reviewed the record and agree with the defendant that such prosecutor's statements as "the law says its not your decision anymore" and "you're not making the finding of the death penalty. You're finding fact," and "the verdict is automatic," and "the law book says what the verdict shall be," arguably violate *Caldwell*. Such state-

ments tend to minimize the jury's role and allow the jurors to feel that the responsibility for determining the appropriateness of the death sentence rests elsewhere. *West,* 767 S.W.2d at 399.

First, however, we note that the stronger statements made up a small part of an extensive voir dire held over a number of days and, therefore, were made several days before the sentencing deliberations. Moreover, unlike the court in *Caldwell,* the trial judge in this case did not endorse the improper remarks, which defense counsel here had allowed to pass without objection. In addition, other portions of the State's final argument correctly set forth the responsibility of the jury under Tennessee's capital sentencing procedure, and the defendant's final argument repeated and re-enforced the State's correct argument. Finally, the trial court, after argument, correctly instructed the jury immediately before they began deliberations as to their responsibility for determining the appropriateness of the death sentence under the law. *See West,* 767 S.W.2d at 399–400. For the foregoing reasons, we find the *Caldwell* error harmless beyond a reasonable doubt. *Id.* at 400.

### B. Right of Limited Cross–Examination

After the guilt hearing and prior to the penalty phase of this bifurcated trial, defense counsel moved that the State be prohibited from cross-examining the defendant during the sentencing hearing with regard to the circumstances of the offense. The defendant insisted that such a ruling would be proper if he chose to take the witness stand for the limited purpose of testifying about mitigating factors unrelated to evidence of the crime for which he had been convicted. The State argued that cross-examination should be permitted on all matters relevant to sentencing, including the circumstances of the offense. The trial court agreed with the State and denied the motion.

The defendant, against the advice of counsel, testified at the sentencing hearing. During direct examination he said that he had been drunk the night of the murder and remembered nothing until he awoke Sunday morning. On cross-examination, the prose-

cuting attorney inquired about the defendant's reaction when he awoke on Sunday to find blood on his clothes, car, and tools. The defendant asserted his innocence and denied that there had been any blood on his clothing the morning after the crime. During closing argument, the prosecutor questioned the defendant's statement that he would black-out when he became drunk and that he had done so on the night of the murder. The prosecutor also skeptically pointed out that the defendant did not volunteer any information about or explain how his fingerprints came to be on the window screen and lightbulb at the crime scene.

The defendant contends in this appeal that the trial court erred by overruling his motion for limited cross-examination. He asserts that he retains his Fifth Amendment privilege not to incriminate himself by discussing the circumstances of the offense if he testifies only about his background and other mitigating circumstances unrelated to the offense itself. Relying on *Lesko v. Lehman,* 925 F.2d 1527, 1542 (3d Cir.), *cert. denied* 502 U.S. ——, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991), the defendant also argues that the prosecutor's remarks during closing argument violated his state and federal constitutional rights against self-incrimination under *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which held that the Fifth Amendment bars a prosecutor from commenting to the jury on the defendant's failure to testify at trial.

While agreeing that the trial court erred, the State argues that any error was harmless because the defendant was only questioned on cross-examination about matters that he reasonably raised during direct. The State further contends that the prosecutor's remark was not error because the defendant had attempted to explain some facts regarding the night of the murder, thereby waiving his *Griffin* rights on the subject.

The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, *see Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964), provides that "[n]o person ... shall be compelled in any criminal case to be a witness against

himself." The United States Supreme Court has held that the Fifth Amendment right against self-incrimination applies to a capital sentencing proceeding. *See Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

In *Estelle,* a psychiatrist testified for the state during the penalty phase, relating statements made by the defendant during a psychiatric examination, despite the fact that the defendant had not been advised of his *Miranda* rights before the examination. The Court ruled that the testimony violated the defendant's Fifth Amendment privilege against self-incrimination, stating that " 'the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.' " *Id.,* 451 U.S. at 462, 101 S.Ct. at 1873 (quoting *In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967)). The Court concluded that "[g]iven the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental guarantees." *Id.,* 451 U.S. at 462–63, 101 S.Ct. at 1873.

While this Court has never expressly addressed the specific self-incrimination issues raised here by the defendant, the United States Supreme Court held in *Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968), that "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination *with respect to the testimony he gives....*" (Emphasis added.) *See also Caminetti v. United States,* 242 U.S. 470, 494, 37 S.Ct. 192, 198, 61 L.Ed. 442 (1917) (It is permissible for the prosecutor or the court to advise the jury that it may draw an adverse inference from the defendant's silence when the defendant has testified as to some facts concerning the crime charged, but has refused to testify as to other facts within his knowledge). Similarly, our own intermediate Court of Criminal Appeals has ruled that:

A witness cannot discontinue testimony as to transactions already disclosed by the witness. Once he discloses a fact, though incriminatory, he must testify with respect to the details of that fact.... A witness who testifies on direct examination is bound to answer questions on cross-examination *with respect to the testimony that he gave on direct.*

*State v. Stapleton,* 638 S.W.2d 850, 855 (Tenn.Crim.App.1982) (Emphasis added).

*Harrison* and *Stapleton* emphasize that a defendant can waive the privilege against self-incrimination *regarding certain subjects* by discussing those subjects on direct examination. Other cases have decided more broadly "that once a defendant takes the witness stand he waives his Fifth Amendment privilege and makes himself liable to cross-examination as an ordinary witness." *United States v. Weber,* 437 F.2d 327, 334 (3d Cir.1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). *See also People v. Szabo,* 113 Ill.2d 83, 100 Ill.Dec. 726, 731, 497 N.E.2d 995, 1000 (1986), *cert. denied,* 479 U.S. 1101, 107 S.Ct. 1330, 94 L.Ed.2d 181 (1987) (testimony at sentencing hearing limited to defendant's good behavior since incarceration was subject to impeachment).

In *Lesko, supra,* 925 F.2d at 1542, however, the Third Circuit Court of Appeals held that a defendant's penalty phase testimony about mitigating factors that are wholly collateral to the charges against the individual does not operate as a complete waiver of the defendant's self-incrimination privilege or rights under *Griffin.* Explaining the rationale for its position, the *Lesko* court concluded:

Without the protection of *Griffin,* a capital defendant in the penalty phase of his trial could avoid prosecutorial comment about his failure to address the charges against him only at the price of not providing what may be his "life or death" testimony about collateral mitigating circumstances. This is too high a price to require the accused to pay for the maintenance of his fifth amendment privilege.

*Lesko,* 925 F.2d at 1543.

Significantly, the *Lesko* court recognized the interplay between the defendant's asserted right to be subjected to only limited cross-examination at the sentencing hearing and the defendant's Eighth Amendment right to

present evidence in mitigation of the crime for which that defendant stands convicted. As we have previously held, a sentencer in a capital case "must not be precluded from considering any relevant mitigating evidence." *State v. Thompson,* 768 S.W.2d 239, 251 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990). Likewise, the United States Supreme Court has recognized that the Eighth Amendment to the United States Constitution *"requires* States to allow consideration of mitigating evidence in capital cases." *McKoy v. North Carolina,* 494 U.S. 433, 442, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990) (emphasis in original). *See also Boyde v. California,* 494 U.S. 370, 377–78, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990). Moreover, as stated in *McKoy:*

> Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, ...; by the sentencing court, ...; or by an evidentiary ruling,.... Whatever the cause, ... the conclusion would necessarily be the same: "Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett* [*v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973], it is our duty to remand this case for resentencing." *Eddings v. Oklahoma,* 455 U.S. [104] at 117, n. [102 S.Ct. 869, 878, n. 71 L.Ed.2d 1] ... (O'Connor, J., concurring)."

*McKoy v. North Carolina, supra,* (quoting *Mills v. Maryland,* 486 U.S. 367, 375, 108 S.Ct. 1860, 1865–66, 100 L.Ed.2d 384 (1988)) (citations omitted).

We agree with the analysis set forth in *Lesko* that recognizes both the Fifth Amendment and Eighth Amendment implications raised in a decision whether to permit only limited cross-examination of a defendant at a capital sentencing hearing. Although we recognize the general Tennessee rule that

"[a] witness may be cross-examined on any matter relevant to any issue in the case ...," Tenn.R.Evid. 611(b), we are also cognizant of the gravity of a capital sentencing proceeding and the constitutional mandate to ensure that all relevant mitigating circumstances be presented to a sentencing body. We thus conclude that, only in the limited sphere of a death penalty sentencing hearing, a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does *not* operate as a complete waiver of the privilege against self-incrimination.[5] Accordingly, a defendant has a right to limited cross-examination if he or she wishes to testify about only collateral mitigating circumstances at the penalty phase of a capital trial. We reiterate, however, that even in such special situations, a defendant may be completely and thoroughly cross-examined about all testimony given or fairly raised by that defendant on direct examination.

Applying that rule to the present case, it is clear that the trial court's failure to limit cross-examination of the defendant did not result in prejudicial error. The defendant testified on direct examination about the night of the murder and said that he could not remember anything after becoming drunk until he awoke the next morning. It was, therefore, not error for the prosecutor to inquire specifically into the defendant's memory of the next day, including the physical condition of his clothing, car, and tools when he awoke. In view of the defendant's testimony during direct examination, the inquiries propounded by the prosecutor were proper.

We further conclude that the comments made by the prosecutor during closing argument did not violate the principles set forth in *Griffin.* The United States Supreme Court has held that *Griffin* does not prohibit a prosecutor from commenting on a defendant's silence, if such comment is a fair re-

---

5. *Compare* Tenn.R.Evid. 104(d), which provides that an "accused does not by testifying upon a preliminary matter become subject to cross-examination as to other issues in the case." Preliminary questions include the qualification of a person to be a witness, the existence of a privi-

lege, or the admissibility of evidence. Tenn. R.Evid. 104(a); *see also* Tenn.R.Evid. 608(b)(3), accused does not waive the privilege against self-incrimination when testifying as to matters relating to credibility.

sponse to a position taken by either the defendant or defense counsel. *See United States v. Robinson,* 485 U.S. 25, 31–33, 108 S.Ct. 864, 868–70, 99 L.Ed.2d 23 (1988). Here, the prosecutor cast doubt on the defendant's testimony that he was drunk or blacked-out at the time of the offense by describing the calculated and intentional acts that were necessary to break into the victim's home. In addition, the prosecutor argued that the defendant "you know, didn't volunteer anything, you know, explain the fingerprints on the screen and things of that nature, which I thought was somewhat amazing." We conclude that such comments constitute, in this case, a fair response to the defendant's claim of innocence and his claim of memory loss.

### C. Instructional Errors

 The defendant challenges the jury instructions given at sentencing on five general grounds. Because only one of the alleged grounds for relief is contained in the defendant's motion for new trial, the State argues that the defendant has waived most of these challenges. We, however, have elected to consider the five issues raised on the merits as set out below.

First, the defendant argues that the trial court erred in charging the jury according to the statute that existed at the time of the offense on the grounds that the defendant is entitled to have the jury charged according to the statute which is in effect at the time of sentencing. The offense occurred in 1988, and the statute in effect at that time required the jury to find that any aggravating circumstances were not outweighed by any mitigating circumstances in order to impose a death sentence. The sentencing occurred in 1990 and the statute, as amended in 1989, now requires the jury to find that the aggravating circumstances proven by the State outweigh, beyond a reasonable doubt, any mitigating circumstances before the jury may impose a sentence of death. Tenn.Code Ann. § 39–13–204(f) (1991).

We recently held in *State v. Brimmer,* —— S.W.2d —— (Tenn.1994), that where an offense is committed before the effective date of the same 1989 amendment involved in this case, but the trial and sentencing occur after that effective date, a trial court does not err by instructing the jury under the statute as it existed at the time the offense was committed. Here, under the rationale of *Brimmer,* because the offense occurred in April of 1988, and the defendant was sentenced in 1990, the jury instruction under the pre–1989 statute was appropriate. This issue is without merit.

 Equally without merit is the defendant's complaint that the trial court erred by instructing the jury under the pre–1989 statute with regard to the aggravating circumstance that "the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." Tenn.Code Ann. § 39–2–203(i)(5) (1982). The 1989 amended version provides that "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn.Code Ann. § 39–13–204(i)(5) (1991). Again, under our recent holding in *Brimmer,* instruction pursuant to the statute in effect at the time the offense occurred is entirely *proper.* We also find no merit in the defendant's argument that the aggravating circumstance set forth at Tenn.Code Ann. § 39–2–203(i)(5) (1982), is unconstitutionally vague. This Court has previously and repeatedly upheld the validity of this aggravating circumstance in the face of similar attacks, particularly where, as here, the jury has been properly instructed on the meaning of the terms used in the statute in accordance with *State v. Williams,* 690 S.W.2d 517, 526–30 (Tenn.1985). *See State v. Black,* 815 S.W.2d 166, 181 (Tenn.1991).

 The defendant next assigns as error the trial court's action in charging all statutory mitigating circumstances and refusing to charge non-statutory mitigating circumstances. We have in the past been critical of the practice of indiscriminately charging all statutory mitigating circumstances and have suggested instead that trial courts instruct juries only on those mitigating circumstances raised by the proof. *See Smith,* 857 S.W.2d at 15; *State v. Buck,* 670 S.W.2d 600, 608 (Tenn.1984). In the absence of a showing of prejudice, however, any such error does not require reversal because the error generally

benefits the defendant. *Smith, supra.* No prejudice has been shown in this case.

The trial court did not commit error when it refused to charge nonstatutory mitigating circumstances as requested by the defendant. We have repeatedly held that:

> ... the only mandatory instructions with respect to mitigating circumstances are that those *statutory* circumstances which are raised by the evidence shall be expressly charged, and the jury must be told that they shall weigh and consider any other facts or circumstances that are raised by the evidence that they find to be mitigating circumstances, in making the determination of which circumstances, aggravating or mitigating, outweigh the other.

*Smith,* 857 S.W.2d at 15 (quoting from *State v. Hartman,* 703 S.W.2d 106, 118 (Tenn.1985) (emphasis added)). The jury instructions in this case were in accord with the directives of *Smith* and *Hartman.*

### D. Prosecutorial Discretion in Seeking the Death Penalty

■ The defendant argues that the prosecutor's unlimited discretion in selecting candidates for the death penalty results in arbitrary and capricious imposition of the death penalty and renders the entire process unconstitutional. This argument was rejected by the United States Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976), in which the Court held that opportunities for discretionary action occurring during the processing of a murder case, including the authority of the state prosecutor to select those persons for whom he wishes to seek capital punishment do not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty arbitrary or freakish. We apply that rule in this case. *Cf. Cooper v. State,* 847 S.W.2d 521, 536 (Tenn.Crim.App.1992) (discussing prosecutorial discretion in relation to a post-conviction challenge by a capital defendant).

### CONSTITUTIONAL CHALLENGES

Out of an abundance of caution, the defendant next raises a number of issues that he says either render the Tennessee death penalty statute unconstitutional or result in the arbitrary and capricious imposition of the death penalty. Most of the arguments advanced by the defendant have been repeatedly rejected by this Court; therefore, we find it unnecessary to again discuss in detail the reasons for our holdings. For the resolution of those issues we rely upon the authority cited below.

The following arguments raised by the defendant were rejected in *Smith, supra:*

(1) the qualifiers "extreme" and "substantially" as used in the statutory mitigating circumstances set forth at Tenn.Code Ann. § 39–2–203(j)(2) and (8) (1982), unconstitutionally limit the jury's consideration of relevant mitigating evidence;

(2) the "anti-sympathy" instruction violates a defendant's Eighth Amendment rights;

(3) the absence of an instruction advising the jury that the purpose of the weighing process is to determine whether death is the appropriate punishment;

(4) the statute is unconstitutional because the death penalty has been imposed in a discriminatory manner based on wealth, race, geography, and gender;

(5) the death sentence is imposed in an arbitrary and capricious manner because the jury is not instructed as to the effect of a non-unanimous sentencing verdict;

(6) the death penalty is imposed in an arbitrary and capricious manner because the defendant is not allowed to address issues such as parole eligibility, costs of incarceration, general deterrence, and the method of execution; and

(7) the death penalty is *per se* cruel and unusual punishment under all circumstances.

The following arguments raised by the defendant were rejected in *Harris, supra:*

(1) there is a reasonable likelihood the jury understood the trial court's instructions as requiring unanimity on mitigating circumstances; and

(2) appellate review of death penalty cases in Tennessee is constitutionally inadequate.

The following arguments raised by the defendant were rejected in *Caughron, supra:*

(1) the death penalty is arbitrary and capricious because the State has the right of final closing argument at the penalty phase; and

(2) the lack of uniform procedures mandating individual sequestered voir dire during jury selection renders the imposition of the death penalty arbitrary and capricious.

Finally, in *State v. Groseclose,* 615 S.W.2d 142, 147–48 (Tenn.1981), we rejected the argument that an instruction defining and explaining mitigation is constitutionally required.

Likewise we find it unnecessary to repeat our analysis of the issues the defendant lists, without argument, regarding a number of other constitutional challenges which have been previously decided by this Court adversely to his position.[6]

■ The defendant next argues that the Tennessee death penalty statute fails to sufficiently narrow the class of death eligible defendants under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution, because all persons convicted of felony murder are eligible for the death penalty on the sole basis that they committed the underlying felony.[7]

In *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), a majority of this Court held that it is unconstitutional under the Tennessee Constitution, Article I, Section 16, to use the felony murder aggravating circumstance, Tenn.Code Ann. § 39–2–203(i)(7) (1982) or

§ 39–13–204(i)(7) (1991), to support imposition of the death penalty for a conviction of felony murder, although it can be used to support imposition of the death penalty for premeditated murder. We determined that the use of the felony murder aggravating circumstance duplicated the elements of the underlying felony murder crime and failed to narrow the class of death-eligible murderers as required by Article I, Section 16, of the Tennessee Constitution and by the Eighth Amendment to the United States Constitution. We must now determine whether, based on the facts in this case, the sentencing jury's consideration of the invalid felony murder aggravating circumstance is harmless error beyond a reasonable doubt where there are two remaining aggravating circumstances, namely the defendant's previous convictions of violent felony offenses, and that the murder was especially heinous atrocious or cruel in that it involved torture or depravity of mind.

In that connection, we recently held in *Howell,* 868 S.W.2d at 260–61, that

[i]n order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

Our examination of the record in this case in accordance with that analysis demonstrates

---

**6.** *Melson,* 638 S.W.2d at 366–368 (holding that neither written findings concerning mitigating circumstances, nor an instruction allowing the jury to impose a life sentence based on mercy are constitutionally required); *Black,* 815 S.W.2d at 185 (holding that the statute does not violate the constitutional rights of a defendant by mandating that a jury impose death upon finding that aggravating circumstances outweigh mitigating circumstances); *Smith,* 857 S.W.2d at 22–23 (holding that the statute does sufficiently limit exercise of the jury's discretion once matters in aggravation are found, and that the statute is not uncon-

stitutional because it allows the admission of hearsay evidence at sentencing).

**7.** The defendant raised the same argument with regard to Tenn.Code Ann. § 39–2–203(i)(6) (1982) [now § 39–13–204(6) (1991)], "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." This aggravating circumstance was not raised in this case. The issue is without merit.

**270**

that submission of the invalid felony-murder aggravating circumstance for jury consideration was harmless error beyond a reasonable doubt.[8]

The record here fully supports the two remaining aggravating circumstances. The State introduced proof without contradiction of the defendant's prior violent felony convictions of aggravated rape and "assault to murder first degree with bodily injury." Additionally, the evidence strongly supports the jury's finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, beyond a reasonable doubt. The jury was fully and correctly instructed on this aggravating circumstance pursuant to *State v. Williams*, 690 S.W.2d 517 (Tenn.1985). Furthermore, no additional evidence, nor any evidence that was not already properly before the jury, was introduced in support of the invalid felony-murder aggravating circumstance. A sentencing jury may properly hear evidence regarding the circumstances of the offense. In addition, the prosecutor did not emphasize the invalid felony-murder aggravating circumstance. The argument primarily focused on the weaknesses of the defendant's proof in mitigation, with some emphasis on the defendant's prior convictions and the heinous nature of the crime, but with little mention of the felony murder aggravating circumstance. The proof in mitigation included background evidence about the defendant's childhood, evidence of the defendant's drug and alcohol problems that caused him to suffer blackouts, evidence about the defendant's inability to control his urination and its possible connection to a neurological problem and the fights that were brought about as a result of this problem.

Based on our thorough review of the record, we conclude, beyond a reasonable doubt, that the sentence would have been the same had the jury given no weight to the invalid felony murder aggravating factor; therefore,

the *Middlebrooks* error, in this case, was harmless.

■ Finally, we address the defendant's contention that this Court's review of capital cases is constitutionally inadequate to afford a meaningful proportionality review. The defendant bases his claim on the fact that the Tennessee capital sentencing juries are not required to make written findings concerning mitigating circumstances. He also says that the information base for comparative review of all first degree murder convictions is inadequate and incomplete and he asserts that this Court's methodology for conducting comparative review is flawed.

We have emphasized on prior occasions that our comparative proportionality review is not rendered ineffective simply because we have "not chosen to formulate a rigid objective test" as the "standard of review for all cases." *Harris*, 839 S.W.2d at 77, n. 2, quoting *Proffitt v. Florida*, 428 U.S. 242, 259, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976). We do not, however, take lightly our duty to conduct a comparative review in each case to determine whether the penalty imposed is or is not disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. We regularly and routinely review Rule 12 reports submitted by trial judges at the conclusion of all criminal trials for first degree murder. The dissent points out that no Rule 12 report was available in this case. That is correct; however, a Rule 12 report contains far less information than the entire record, which we have thoroughly reviewed in this case. Accordingly, we are well able to conduct the comparative proportionality review based on that knowledge. Because we do not find it necessary in every case to compare in writing, detail by detail, all the specific cases or circumstances which are considered in our proportionality review, it does *not* follow, as the defendant and the dissent seem to suggest, that we have failed to perform an effective comparative proportionality review as out-

---

8. Because we conclude that the jury's consideration of the invalid felony murder aggravating circumstance was harmless error beyond a reasonable doubt, we expressly reserve for later decision the issue raised by the State, to wit, whether it is error under *Middlebrooks* to submit

for jury consideration the felony murder aggravating circumstance when an additional felony, other than the felony underlying the felony-murder conviction, also supports the aggravating circumstance.

lined in *State v. Barber,* 753 S.W.2d 659, 663–668 (Tenn.1988). *See also Harris,* 839 S.W.2d at 77. Accordingly, we reject the defendant's claim that this Court's appellate review is constitutionally inadequate.

■ This Court is of the opinion that the first-degree felony murder of the victim in this case warrants imposition of the death penalty. The record clearly established both of the remaining valid aggravating circumstances. Court records were introduced at the penalty phase to establish the defendant's prior convictions. As to the aggravating circumstance (i)(5)—heinous, atrocious or cruel in that it involved torture or depravity of mind—this Court in *State v. Williams,* 690 S.W.2d 517, 529 (Tenn.1985), defined torture as the infliction of severe physical or mental pain upon the victim while he or she remains alive or conscious. We also said that depravity may be shown by acts occurring at or shortly after the victim's death. A majority of this Court has consistently upheld that aggravating circumstance, as so defined, against constitutional attack. *See State v. Oscar Franklin Smith,* 868 S.W.2d 561 (1993). Here, the jury instructions defined the aggravating circumstance according to *Williams,* and contrary to the conclusion reached by the dissent, the evidence in this record clearly established both torture and depravity. Gladys Skinner was repeatedly and with tremendous force, beaten in the head with a welder's chipping hammer. Her skull was virtually shattered from the force of the numerous blows. Evidence indicated that the assault may have continued for some time, and that the victim would not necessarily have lost consciousness immediately. Defensive wounds to Gladys Skinner's arms and hands indicate that she did not, in fact, lose consciousness immediately upon being assaulted, and that she was struggling to protect herself. Accordingly, the evidence showed torture, as defined in *Williams.* Moreover, the fact that Skinner was raped at or near the time of death is further evidence of the depravity of the crime. We have considered the character of the defendant, including the mitigating proof and his prior violent acts. We are convinced that the penalty imposed was neither arbitrary, excessive or disproportionate to the penalty imposed

for similar crimes. *See State v. Hines,* 758 S.W.2d 515 (Tenn.1988); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985); *State v. House,* 743 S.W.2d 141 (Tenn.1987); *State v. Campbell,* 664 S.W.2d 281 (Tenn.1984); *State v. Williams,* 657 S.W.2d 405 (Tenn.1983); *State v. Black, supra.*

### *CONCLUSION*

We have carefully considered the defendant's contentions as to the alleged errors occurring during the guilt and sentencing phases and conclude the defendant's conviction and death sentence should be affirmed.

In accordance with the mandate of Tenn. Code Ann. § 39–13–206(c)(1)(D) (1991) [formerly Tenn.Code Ann. § 39–2–205(c)(4) ], we find that the sentence of death was not imposed in an arbitrary fashion, that the evidence overwhelmingly supports the jury's finding of the statutory aggravating circumstances, and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance. Further, our comparative proportionality review reveals that the sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and character of the defendant.

We, therefore, affirm the conviction of first-degree felony murder and the sentence of death. The sentence will be carried out as provided by law on the 14th day of May, 1994, unless otherwise ordered by this Court or by other proper authority. Costs of this appeal are assessed against the defendant, Victor James Cazes.

DROWOTA and O'BRIEN, JJ., concur.

REID, C.J., concurs and dissents.

DAUGHTREY, J., not participating.

REID, Judge, concurring and dissenting.

I concur in affirming the conviction of first degree murder. However, I would hold aggravating circumstance (i)(5) (T.C.A. § 39–2–203(i)(5) (1982)) invalid and find the sentence of death disproportionate.

For the reasons discussed in *State v. Black*, 815 S.W.2d 166, 195–97 (Tenn.1991) (Reid, C.J., dissenting), aggravating circumstance (i)(5), "The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," is not a valid aggravating circumstance in this case. This aggravating circumstance can be established only by proof that the victim was *tortured* in the course of the murder or the murder demonstrated *"depravity of mind."* The evidence shows the various physical injuries imposed upon the victim, including the cause of death, but there is no evidence of torture. The majority opinion, which dismisses the issue summarily, does not indicate whether the proof showed that the victim was tortured or the defendant depraved. *See supra* at 267–268. However, even the majority's description of the evidence relied upon in its comparative proportionality review shows clearly that the evidence proves neither torture nor depravity. That the "[e]vidence indicated that the assault *may have continued for some time,* and that the victim *would not necessarily* have lost consciousness immediately"[1] does not obviate the equally likely conclusion that death resulted from the first blows struck. This evidence is not sufficient to support a finding of torture or depravity.

Also, for the reasons discussed in *State v. Black,* aggravating circumstance (i)(5), prior to the 1989 amendment, is unconstitutionally vague, and, therefore, is invalid. Use of "depravity" in a jury instruction defining what can be used as an aggravator, without more than the *State v. Williams*[2] definition of that term, constitutes a violation of the state and federal constitutions and requires that the sentence be vacated. *See State v. Black,* 815 S.W.2d at 195–97, (Reid, C.J., dissenting); *State v. Van Tran,* 864 S.W.2d 465, 485–90 (Tenn.1993) (Daughtrey, J., dissenting); *Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) *(per curiam,* Marshall, J., concurring).

I also would hold that under the comparative proportionality review mandated by statute, the sentence of death is disproportionate to the sentences in similar cases. *See* T.C.A. § 39–13–206(c)(1)(D) (Supp.1993). Pursuant to the statute, the defendant and his criminal acts must be compared with other similar offenders and acts committed in order to determine if the defendant is one of those persons most deserving of the sentence of death. *See State v. Harris,* 839 S.W.2d 54, 84 (Tenn.1992) (Reid, C.J., dissenting); *State v. Howell,* 868 S.W.2d 238, 265 (Tenn.1993) (Reid, C.J., concurring).

Even though the majority defends the failure of the Court "to formulate a rigid objective test" and insists that the Court does not "take lightly [its] duty to conduct a comparative review in each case . . ." and does "regularly and routinely review Rule 12 reports submitted by trial judges," the opinion does not reflect the basis on which it concludes that the sentence is not disproportionate, except to repeat the physical evidence. *See supra* at 270–271. The majority is not able to insist that the Rule 12 report was utilized in this case because contrary to the requirements of the Rules of the Supreme Court, it does not appear in the record nor was it transmitted to the Clerk of the Supreme Court. *See* Tenn.Sup.Ct.R. 12. To satisfy the statutory requirement of a comparative proportionality review, this Court must do more than restate the facts of the case. *See State v. Middlebrooks,* 840 S.W.2d 317, 354–55 (Tenn.1992) (Reid, C.J., concurring and dissenting); *State v. Harris,* 839 S.W.2d at 84–85.

The victim was 68 years old, the defendant was 27. There is no evidence as to the relationship between the defendant and the victim except that the defendant worked for the victim's step-grandchild, the defendant had repaired the victim's automobile at her residence several times, and on the night of the murder, the defendant had attended a party at the step-grandchild's house, which was located a few blocks from the victim's residence. The evidence of the murder is entirely circumstantial. It proves the defendant committed the murder; it shows how the murder was committed; but it does not show why. In my view, the record does not

---

**1.** *Supra* at 270–271 (emphasis added).

**2.** 690 S.W.2d 517, 529–30 (Tenn.1985).

contain sufficient proof to support the finding that the death sentence is warranted. I would reverse the sentence of death and impose a sentence of life imprisonment.

## ORDER ON PETITION
## FOR REHEARING

PER CURIAM.

The appellant, Victor James Cazes, has filed a petition for rehearing in this cause, which the Court has considered and concludes should be denied.

It is so ORDERED.