IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 11, 2000

## STATE OF TENNESSEE v. MANOLITO JEMISON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-A-482    Steve Dozier, Judge**

_____

**No. M1999-00752-CCA-R3-CD - Filed November 22, 2000**

_____

The defendant was found guilty by a Davidson County jury of the lesser offense of voluntary manslaughter on one count of first degree premeditated murder and the lesser offense of reckless homicide on one count of felony murder. The counts were merged into one conviction for voluntary manslaughter, and the defendant was sentenced as a Range I, standard offender to six years in confinement. In this appeal as of right, the defendant challenges the sufficiency of the evidence to support a conviction for voluntary manslaughter and the length of his sentence, arguing that the trial court erroneously applied one enhancement factor and failed to apply two mitigating factors. Based upon our review, we agree that an enhancement factor was improperly applied. However, since two other enhancement factors were properly applied, and the evidence was sufficient to support the conviction, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES, J., and CORNELIA A. CLARK, SP.J., joined.

Karl Dean, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); Laura C. Dykes, Assistant Public Defender (at trial); and Gigi Braun, Assistant Public Defender (at trial), for the appellant, Manolito Jemison.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Bernard F. McEvoy, Assistant District Attorney General; and Derrick L. Scretchen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Manolito Jemison, was indicted by a Davidson County Grand Jury for one count of first degree premeditated murder and one count of aggravated assault. That indictment, number 98-C-2236, was subsequently dismissed. A superseding indictment, number 99-A-482, was

issued charging the defendant with one count of first degree premeditated murder and one count of felony murder, both counts stemming from the shooting death of the victim. The superseding indictment also charged the defendant with one count of aggravated assault, stemming from an injury to a witness at the scene of the crime. At the conclusion of the State's proof in the trial on these indictments, the trial court granted, without objection from the State, the defendant's motion for judgment of acquittal on the aggravated assault charge. Subsequently, the jury found the defendant guilty of voluntary manslaughter and reckless homicide.

At the sentencing hearing, the trial court merged the two convictions into one for voluntary manslaughter, a Class C felony, and sentenced the defendant as a Range I, standard offender, to six years in continuous confinement. The defendant appeals as of right from his conviction and sentence, presenting the following two issues for our review:

> I. Whether the evidence was sufficient to support a conviction for voluntary manslaughter; and

> II. Whether the trial court erred in sentencing the defendant to the maximum sentence for the offense.

Based on our review of the record, we conclude that evidence adduced at trial was sufficient to support a finding by a rational trier of fact that the defendant was guilty beyond a reasonable doubt of the offense of voluntary manslaughter. Although we agree that an enhancement factor was improperly applied, the other factors justify the sentence imposed. The judgment of the trial court is affirmed.

## FACTS

The events leading up to the shooting death of the victim took place against a backdrop of cocaine use and sales in Cumberland View Apartments, a housing complex in North Nashville known as "Dodge City." Although the defendant did not live in the complex, he had regularly visited in the apartment of William Whitworth, the victim, over a period of some three months prior to the shooting. The victim was unemployed and a regular cocaine user who lived in his two-bedroom apartment in Dodge City with his four-year-old son. The defendant and two other individuals, one a cocaine dealer known as "Little Johnny," and the other an individual known as "Black," spent time in the victim's apartment where the victim sometimes "cooked" for them, that is, processed powder cocaine into rock form.

On June 22, 1998, the defendant decided not to report for work at his job as a groundskeeper at a funeral home and instead to go to Dodge City to sell drugs. On this day, the defendant, Little Johnny, and Black were all at the victim's apartment when the victim's younger brother, Maurice Whitworth, arrived at approximately 7:00 p.m. with a car trunk full of groceries for his brother. This largess was possible because Maurice Whitworth had acquired some $5,200 in cash on that day as a result of what he described as his "work," which was forging checks and then cashing them at large

grocery store chains. Little Johnny, Black, and the defendant helped carry the groceries up to the victim's apartment and then sat around in the victim's living room for about forty-five minutes.

Before Maurice Whitworth left his brother's apartment at approximately 9:00, he and his brother went into his brother's bedroom to smoke cocaine. He testified that the bedroom was the victim's usual place to smoke drugs because, "He [the victim] was real particular about that cause he always said, 'Man, come on back here. Don't do nothing up front,' you know. Said, 'Come on back here where I can hear the door, just set [sic] back here in the back in the bedroom.'" Maurice Whitworth came back to his brother's apartment one more time around 11:00 p.m., this time to pick up some powder cocaine for his personal use from a dealer in the building. He testified that when he stopped at his brother's apartment, only his brother and his four-year-old son were there. That was the last time he saw his brother alive.

The defendant testified at trial that on the evening of June 22, after he, Little Johnny, and Black carried the load of groceries from Maurice Whitworth's car to the victim's apartment, they all three sat around laughing and talking and then left. The defendant and Little Johnny stood around outside in hopes of selling drugs. Eventually, the defendant decided to "call it a day." He drove to the home he shared with his girlfriend and their two children in another housing complex some five miles away. The defendant testified he recalled at some point that, weeks earlier, the victim had shown interest in acquiring a weapon. The defendant returned to the victim's apartment around 11:00 p.m. with a shotgun in a gym bag. The shotgun was loaded with three shots.

Confusing and often conflicting testimony obscures subsequent events.[1] Nevertheless, it appears from the record that the defendant was let into the apartment by the victim. At the time he arrived, a neighbor, Lynn Frey, was in the victim's bathroom. The defendant observed that the victim appeared to be "high" on drugs when he came to the door. The testimony of Dr. Emily Ward, a forensic pathologist, confirmed the presence of cocaine in the victim's blood. According to the defendant, he asked the victim if he wanted to buy the gun, and the victim asked first if it was loaded. The defendant testified that the victim grabbed the gun by the barrel, and a struggle ensued. The two of them were alone when this occurred. According to the defendant, the victim was able to shove him face down onto a sofa and then hold him there by jumping on his back and pressing his knees into the defendant's back and neck. The shotgun was beneath the defendant's body with the barrel facing toward the front door. A glass table in front of the sofa was broken in the struggle, and a television was knocked over. At some point, Lynn Frey emerged from the bedroom. The victim was yelling for "girl" to call the police. According to Ms. Frey, the shotgun was between the defendant and the victim, presumably touching the defendant's back and the victim's chest. She did not see who pulled the trigger, causing the gun to discharge the first time. Ms. Frey was moving

---

[1]We are assisted substantially in our effort to unravel the sequence of events by the balanced and thorough brief of defendant's counsel on appeal.

toward the front door when the shotgun discharged, the shot hitting the door. Some fragments apparently hit Ms. Frey in the leg,[2] but she was able to get out of the apartment and call 911.

The defendant and the victim were again alone. According to the defendant, he freed himself by knocking the victim down. The defendant pumped the shotgun, chambering a shell, because, according to his testimony, he felt he might need to protect himself. Holding the gun, he started to walk out the front door when the victim rushed him from behind and, in the ensuing struggle for the gun, a second shot was fired, this time grazing the victim's leg and causing him to fall to the floor. While on his knees, the victim grabbed the gun barrel with both hands and attempted to pull the gun from the defendant. The victim and the defendant continued to struggle for the gun until the victim, still holding the gun with both hands, according to the defendant, lay on his back with his upper torso out the front door and his lower torso inside the apartment. The defendant still held the stock end of the gun. The defendant hypothesized that in pulling the gun back and forth between them, the gun was somehow pumped again, and a third shot was fired. This shot entered the victim's chest and caused his death.

The defendant left the apartment, dropped the shotgun in a grassy area adjacent to the apartment building, and drove to the apartment he shared with his girlfriend. The following day, he turned himself in to the police and gave a statement to the police in which he maintained that the shooting was an accident.

Bronzetta Frey, the sister of Lynn Frey, testified for the prosecution. She said that she was in the parking lot of the building where the victim lived when all three shots were fired. She had just returned to the complex in the company of her young nephew, Lynn Frey's son. Her nephew got out of the vehicle first and immediately started up the stairs to the victim's apartment, looking for his mother. After she heard the first shot, she yelled for her nephew to come to her, and they got behind the vehicle they had arrived in. She testified that she then saw the defendant back out of the door of the victim's apartment, holding a shotgun. The victim, according to Ms. Frey, was facing the defendant and holding onto the barrel end of the shotgun when the second shot was fired. After this shot, the victim crumpled and twisted, still holding the gun, until he was lying on his back with the defendant standing over his head. She described the scene as one where "the barrel of the gun was going round and round Mr. Whitworth's chest and head." The third shot was fired and the victim went limp. According to the autopsy, the victim sustained a superficial wound to his left thigh and died as the result of a single gunshot wound to the chest. Cocaine was detected in his blood.

---

[2] Based on this event, the defendant was charged with aggravated assault by use of a deadly weapon, naming Ms. Frey as the victim. The charge was dismissed by the trial court at the conclusion of the State's proof.

## ANALYSIS

### Issue I.  Sufficiency of the Evidence

The defendant contends that the evidence was insufficient to convict him of voluntary manslaughter because the proof failed to establish that he acted knowingly or intentionally or that he was provoked.  He contends that he should have been convicted of the lesser offense of reckless homicide and that the killing was accidental.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State.  See State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).  In conducting our evaluation of the convicting evidence, we are precluded from reweighing or reconsidering the evidence.  See State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996).

The defendant was charged with first degree premeditated murder and found guilty of voluntary manslaughter.[3]  Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."  Tenn. Code Ann. § 39-13-211(a) (1997).  A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Id. § 39-11-106(a)(18).  "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Id. § 39-11-106(a)(20).

The evidence showed that the defendant left Dodge City in the evening of June 22, 1998, after a day of selling cocaine. He drove to the apartment he shared with his girlfriend and their two children to retrieve a shotgun that was kept on a shelf in his closet.  He then returned to the victim's apartment with the loaded shotgun.  The evidence showed that a struggle between the defendant and the victim ensued.  Furniture was broken in the struggle that, at one point, led to the defendant's being pinned down by the victim.  The defendant, at 240 pounds and half the age of the victim, was

---

[3]As noted above, the defendant was also charged in count two with felony murder, based on the underlying felony of robbery.  The jury found the defendant guilty of reckless homicide as included in count two.  The two verdicts, one for voluntary manslaughter as included in count one and one for reckless homicide as included in count two, were merged into one conviction for voluntary manslaughter.  At the hearing on the defendant's motion for a new trial, the defendant argued that the verdicts were inconsistent.  The law in this state is that "consistency between verdicts on separate counts of an indictment is not necessary." Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973).  This court has stated that "[i]nconsistent verdicts are permitted as long as there is sufficient evidence to permit a rational fact finder to find a defendant's guilt beyond a reasonable doubt on the charges on which the defendant was convicted." State v. Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433, at *3 (Tenn. Crim. App. Dec. 3, 1997 at Jackson).  Our determination, therefore, is whether the evidence was sufficient to support the defendant's conviction for voluntary manslaughter.

able to get the upper hand and finally stood over the victim as he lay half in and half out of his doorway. We conclude that the evidence justified the jury's determination that the defendant intentionally responded to the provocation of the victim, which included shoving the defendant face down onto the sofa, by firing a shotgun directly into the victim's chest at close range. The evidence was, therefore, sufficient to convict the defendant of voluntary manslaughter, and the State sufficiently overcame the defendant's contention that the killing was accidental.

## Issue II. Excessive Length of Sentence

At the conclusion of the sentencing hearing, the trial court sentenced the defendant to six years imprisonment upon his conviction for voluntary manslaughter. As a Range I, standard offender, the defendant thus received the maximum sentence allowable by law. The defendant argues that the sentence imposed was excessive because the trial court improperly applied statutory enhancement factor (16): "The crime was committed under circumstances under which the potential for bodily injury to a victim was great[.]" Tenn. Code Ann. § 40-35-114(16). The defendant further asserts that the trial court erred in failing to apply two additional statutory mitigating factors: "The defendant acted under strong provocation[,]" id. § 40-35-113(2), and the defendant expressed remorse, id. § 40-35-113(13).

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. See id. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823, S.W.2d 166, 169 (Tenn. 1991). The Sentencing Commission Comments to Section 40-35-401 provide that the burden is on the defendant to show the impropriety of the sentence. Concluding that the trial court properly considered sentencing principles and relevant facts and circumstances, our review is *de novo*.

Our review requires an analysis of the following: (1) evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Smith, 735 S.W.2d 859, 862 (Tenn. Crim. App. 1987).

The offense of voluntary manslaughter, a Class C felony, requires a sentence of three to six years for a Range I, standard offender. The trial court is required to begin with the presumptive minimum sentence, enhance within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. See Tenn. Code Ann. § 40-35-210(c), -(e). The weight to be afforded any appropriate factor rests within the sound discretion of the trial court. See State v. Boggs, 932 S.W.2d 467, 475-76 ( Tenn. Crim. App. 1996).

## A. Enhancement Factors

The trial court applied three statutory enhancement factors to the defendant:

(1)     The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; . . .

(9)     The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; . . .

(16)    The crime was committed under circumstances under which the potential for bodily injury to a victim was great[.]

Tenn. Code Ann. § 40-35-114(1), -(9), -(16).  The defendant does not dispute the application of enhancement factors (1) and (9), both of which are supported by the record.  The defendant disputes only the application of factor (16), that the "crime was committed under circumstances under which the potential for bodily injury to a victim was great."  During the sentencing hearing, the trial court stated that factor (16) applied because of the potential for serious bodily injury to Lynn Frey.  The defendant argues that the injury to Ms. Frey occurred as a result of the first shot's being fired and not as a result of the third and fatal shot; therefore, she was not present when the "crime was committed" because she had left the apartment and was removed from any danger.  The State argues, on the other hand, that although Ms. Frey was not present when the fatal shot was fired, that is not the requirement of the enhancement factor.  According to the State's argument, factor (16) provides that the crime must be committed *under circumstances* under which the *potential* for bodily injury is great.  The circumstances of this offense, according to the State, do not just involve the fatal shot; they began when the defendant arrived at the victim's apartment with a loaded shotgun.

First, we note that a statutory enhancement factor may not be used to enhance a sentence if it is an essential element of the offense as charged.  However, enhancement factor (16) deals with potential for injury in circumstances where persons other than the victim of the convicted offense are in the area and are subject to possible injury.  See State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995) (holding that factor (16) "may be applied in situations where individuals other than the victim are in the area and are subject to injury").

With regard to the application of enhancement factor (16), the defendant's argument is persuasive.  First, we note there is no proof that the defendant did not, as he claimed, bring the shotgun to the apartment to sell to the victim.  Additionally, as to how the victim and the defendant became entangled as they were when first seen by Lynn Frey, we also have only the defendant's version.  She testified that the defendant was on the sofa where the victim had pinned him, the shotgun being between the two of them although the defendant said that it was pinned beneath him.  Thus, it was not obvious to her who was the aggressor or who had control of the weapon.  This was the position of the parties when the shotgun discharged, wounding Frey.  We cannot say that an

offense was being committed by the defendant at that time. In fact, the State theorizes in its brief that the jury did not believe that the defendant came to the apartment to kill the victim but was adequately provoked into doing so. Additionally, although the proof showed that the defendant pumped the shotgun after the first and second shots, each time causing a round to be chambered, there is no proof that a shell was not already in the chamber when he arrived at the apartment. Thus, there is no proof that the defendant chambered the round which wounded Lynn Frey. Although the State argues that the firing of the first shot was "part of the circumstances of the offense," we do not find this reasoning persuasive. For instance, if the altercation had ended after the first shot which wounded Ms. Frey, it is difficult to predict what criminal charges would have resulted or against whom. Also, we note that it was the third shot which resulted in the death of the victim, not the first, which wounded Ms. Frey, or even the second. Accordingly, we conclude that factor (16) could not be applied to the wounding of Ms. Frey. Although the trial court did not consider whether there could have been danger to other victims, so as to apply factor (16), we will consider whether this factor could be applied because of the children in the area.

There was proof that the victim's four-year-old child was sleeping in a nearby bedroom in the victim's apartment at the time of the altercation. There was also proof that Lynn Frey's young son was on the stairs headed for the victim's apartment just before the shotgun was fired the first time; that Bronzetta Frey yelled for her nephew to run to her so they both might take cover; and that another young boy was just outside the victim's door at the beginning of the encounter. We apply the same reasoning and conclude that these two children cannot be considered as factor (16) "victims" because at the time of the first shot, the only one which might have threatened them, the proof does not show that the defendant was committing a crime. Additionally, we note that the area was a housing complex where individuals tended to congregate at all hours. However, there was no showing that others were endangered. Accordingly, factor (16) cannot be applied.

## B. Mitigating Factors

The trial court applied only one statutory mitigating factor requested by the defendant: "The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]" Tenn. Code Ann. § 40-35-113(11). The trial court found an "unusual scenario" on the particular evening of the offense and concluded that it was unlikely that a sustained intent to violate the law motivated the defendant's conduct. Nevertheless, the trial court found that mitigating factor (11), although present, should not be given much weight.

The trial court declined to apply a second mitigating factor requested by the defendant: "The defendant acted under strong provocation[.]" Id. § 40-35-113(2). The defendant argues that the jury verdict of voluntary manslaughter establishes that he acted "under strong provocation" and in self-defense.[4] We disagree. Voluntary manslaughter requires only "adequate provocation" not "strong provocation." As to the existence of strong provocation in this case, the trial court stated that "even

---

[4]Self-defense was not argued or requested at trial as a defense to the fatal shooting of the victim.

-8-

though we have a manslaughter conviction, which involves an altercation . . . I'm not of the opinion that it rises, in this factual situation, and merits the Court finding that there was strong provocation." The trial court also noted that the defendant's theory remained that the shooting was accidental, therefore provocation was, and continues to be in the present appeal, denied by the defendant. In spite of this tactical contradiction, we address the appropriateness of applying factor (2) in mitigation.

We note first that "[a] jury's verdict reflecting that consideration of a potential mitigating factor led to a conviction for a lesser included offense may render that mitigating factor inappropriate for further consideration in sentencing." State v. David Keith Daugherty, No. 03C01-9203-CR-00082, 1993 WL 330454, at *5 (Tenn. Crim. App. Aug. 27, 1993 at Knoxville). Although there is no prohibition against a trial court's giving a defendant "double credit," mitigating factor (2) need not be automatically applied in voluntary manslaughter cases. See State v. Paul Galbreath, No. 01C01-9406-CC-00204, 1995 WL 518878, at *5 (Tenn. Crim. App. Sept. 1, 1995 at Nashville) (citing State v. McKinzie Monroe Black, No. 01C01-9401-CC-00006 (Tenn. Crim. App. July 14, 1995 at Nashville)). Here, the defendant returned to the victim's apartment with a loaded shotgun. The victim, high on cocaine, pinned the defendant on a sofa and struggled for control of the shotgun. While the jury may have found such provocation adequate to reduce the defendant's culpability, the nature and circumstances of this crime do not demonstrate the kind of "strong provocation" that would support application of this mitigating factor. We conclude that the trial court appropriately declined to apply mitigating factor (2).

Finally, the defendant argues on appeal for the application of remorse as a mitigating factor under the "catch-all" mitigating factor (13), which permits the application of "[a]ny other factor consistent with the purposes of this chapter." Tenn. Code Ann. § 40-35-113(13). The defendant did not ask the trial court to consider remorse at the sentencing hearing, and the only testimony concerning remorse was given when the defendant testified that he was not going to keep on selling drugs and was "very sorry" for what he had done. The defendant claimed to be "working on his anger problem" but on cross-examination admitted that this did not involve any sort of structured program. Nothing in the evidence indicates any compelling reasons to support the application of this mitigating factor. Further, an appellate court is simply not able to access the genuineness of the defendant's remorse, not having viewed his testimony in this regard, and the trial court's not being addressed on this issue.

We conclude that the trial court properly applied two enhancement factors, giving great weight to both. We do not disagree with the trial court's application of one mitigating factor, the lack of any sustained intent to violate the law as motivating the crime, but agree that this factor should be given little weight. Judges need not place any specific numerical value on enhancement or mitigating factors but are free to weigh them as they feel appropriate. Here the trial court determined that a criminal history, coupled with the use of a deadly weapon in circumstances where other individuals were highly likely to be injured completely outweighed the only, marginal mitigating factor. Even though we have concluded that enhancement factor (16) could not be applied, two other enhancement factors, both of which were given great weight by the trial court, still

apply. Accordingly, the sentence imposed was appropriate. <u>State v. Lavender</u>, 967 S.W.2d 803, 809 (Tenn. 1998).

**CONCLUSION**

The evidence is sufficient to support a conviction of voluntary manslaughter and punishment of six years in confinement. We therefore affirm the trial court.

_____

ALAN E. GLENN, JUDGE