IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 17, 2001

## DEADRICK M. PIGG v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-C-1315      Cheryl Blackburn, Judge**

_____

### No. M2000-03233-CCA-R3-CD - Filed July 18, 2002

_____

A Davidson County grand jury indicted the defendant on one count of felonious unlawful possession of a weapon and one count of misdemeanor evading arrest. Following a jury trial, the defendant was acquitted of the weapons offense but convicted of evading arrest. At the conclusion of a sentencing hearing, the trial court sentenced the defendant to eleven months and twenty-nine days for this conviction. The court also ordered this sentence to run consecutively to another sentence stemming from a separate arrest. The defendant next unsuccessfully filed a motion for a judgment of acquittal or, in the alternative, a new trial. Through this appeal he continues to assert that the evidence is insufficient to support his conviction. However, after reviewing the record, we find that this issue lacks merit and, therefore, affirm the defendant's conviction for evading arrest.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J. and DAVID H. WELLES, J., joined.

Larry B. Felts, Nashville, Tennessee, for the appellant, Deadrick M. Pigg.

Paul G. Summers, Attorney General & Reporter; Peter M. Coughlan, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Grady Moore, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**Factual Background**

On July 27, 1998, undercover officers Curt Konyha and Brian Gregory "were investigating complaints about street level drug transactions taking place." At trial Konyha testified that he had driven an unmarked vehicle alongside the defendant to allow Gregory to talk with the defendant from the passenger seat. Konyha added that he had heard "an arrangement . . . made that the defendant would sell . . . [to] Gregory what is known as crack cocaine, a white rock substance, for forty

dollars." According to Konyha, at the time the arrangement was made, he saw in the defendant's hand a white rock substance of an appropriate size for the dollar amount promised. However, the deal was never completed. Konyha explained that as Metro take-down units approached, the defendant said "Vice" and ran from the undercover vehicle.[1]

Providing more information about the take-down units, Konyha testified that their role is to make arrests in these situations after a subject is identified as taking part in some form of criminal activity. Konyha stated that the individuals in this unit wear "raid vests which quickly identif[y] them as police officers" since the vests have "police" on the front and on the back. Furthermore, the witness indicated that the unit's vehicles have sirens and blue lights that were in use as the defendant ran. Moreover, Konyha stated that from his car during the chase, he heard the officers yelling, "Police[. S]top." He estimated that the officers were about thirty yards from the defendant when this command was first given. Finally, the officer testified that the lighting had not caused a problem with the ability to see others. He explained that, had such been a problem, the enterprise would have been called off for safety's sake.

Next, Officer William Mackall of Metro Nashville's Vice Division recounted the events of that evening. He stated that as his vehicle entered the street on which the transaction was occurring, the defendant fled. According to Mackall's recollection, Mackall had not used his siren during the approach but may have activated his blue lights at some point. However, he added that his was not the only take-down vehicle involved and that others may have employed both of these devices. He also confirmed that the raid vests worn by the take-down officers have police patches and the word "police" on them. This witness testified that he believed that the defendant had only been approximately thirty feet from him when he had left his car to pursue the defendant. Mackall added that during this pursuit he had "kept yelling, ['] Police[. G]et on the ground. You are under arrest.'" While this witness acknowledged that the defendant may well not have turned around to look at the officers as he ran, Mackall opined that the defendant was within earshot during this time. Nevertheless, the defendant did not stop. Mackall further testified that the defendant continued running through an alley where he and the other two suspects were faced with another officer yelling, "Police[. G]et down." Though one of the suspects stopped at that point, the defendant and the third individual continued into a house and hid in one of its bedrooms. Mackall stated that these two suspects stayed in that room though Mackall and other officers were saying, "Police[. C]ome out with your hands up" while searching through the home.

In addition to Konyha and Mackall, the prosecution called David Corman, the aforementioned officer in the alley. This officer testified that he too was part of the take-down unit that evening and had been wearing a vest with police badges and the word "police" on it. From his position in the alley, he saw individuals running toward him and could hear the police yelling for the suspects to "stop" and to "get on the ground." As the individuals approached him, Corman also verbally identified himself a police officer and told the individuals to get on the ground. Only one of the three complied. According to Corman, the defendant looked right at him. Again Corman told him to get on the ground and stated that the defendant was under arrest. However, the officer recounted that the defendant had continued running.

---

[1] The alleged narcotics were never recovered.

Finally, the defense called Victor Scruggs to testify during its case in chief.[2] Scruggs was one of the three individuals who ran from the authorities on the night in question, and it was into his family's house that the defendant and this witness had fled. Scruggs stated that he had been waiting outside on the 27th for his girlfriend, and the defendant had been sitting with him, "[m]inding his own business." This individual further explained that they ran only because one of the cars had jumped the sidewalk, and he had thought that it was going to hit them. He specifically denied knowing that the individuals chasing them were police officers. He also claimed ownership of the weapon found along the path of their extended flight and asserted that he had thrown it down, in spite of his fear that someone was going to run over them, because the gun was weighing down his pants.

As noted previously, the jury convicted the defendant of evading arrest at the close of this proof. Through this appeal the defendant avers that the evidence provided is insufficient to support his conviction.

## **Sufficiency**

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence in evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. While the trier of fact must able to "determine from the proof that all other reasonable theories except that of guilt are excluded," a criminal offense may be established exclusively by circumstantial evidence. State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); see also, e.g., State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987).

With these principles in mind, we turn to the statutory definition of evading arrest. According to Tennessee Code Annotated section 39-16-603, "it is unlawful for any person to intentionally flee by any means of locomotion from anyone the person knows to be a law

---

[2] Additional testimony was taken in this trial, but this testimony was more focused on the weapons charge, of which the jury acquitted the defendant. We, therefore, have not summarized this proof.

enforcement officer if the person: (A) [k]nows the officer is attempting to arrest the person; or (B) [h]as been arrested." Tenn. Code Ann. § 39-16-603(a)(1)(A), (B).[3] Applying this definition to the facts of the instant case, we find the evidence sufficient to support the defendant's conviction.

The record reflects that the defendant said "Vice," abandoned a sale of something purported to be narcotics, and ran as the take-down units approached. He did not stop when Officer Mackall and others visually and verbally identified as police officers commanded him to do so. Through Scruggs, the defendant attempted to show that the officers were not, in fact, visually identifiable as the police and that the commands of the police could not be heard. However, conflicting testimony was presented through other witnesses, and the jury could have easily found the account presented by Scruggs to be less than credible. Furthermore, while the defendant may not have looked back to see the word "police" and the police patches on Mackall's raid vest, the defendant apparently came face to face with Corman, who wore one of the above-described raid vests and who ordered the defendant to get on the ground because the defendant was under arrest. Though another of the suspects stopped at that time, the defendant did not. The defendant continued his refusal to comply with Mackall's orders as he ran into the home of Scruggs' family. While hiding in Scruggs' bedroom, he refused to surrender himself despite the authorities' identifying themselves as the police and ordering him to come out with his hands in the air.

Under these facts, the defendant has not overcome the presumption of guilt placed on him by his conviction. The evidence is sufficient to support the jury's finding him guilty of evading arrest. This allegation is, therefore, without merit.

### Conclusion

For the foregoing reasons we find that the defendant's issue does not merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

---

JERRY L. SMITH, JUDGE

---

[3] The code further provides that "[i]t is a defense to prosecution under this subsection that the attempted arrest was unlawful." Tenn. Code Ann. § 39-16-603(a)(2). However, this defense is not an issue in the present case.

-4-