IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 28, 2004

**STATE OF TENNESSEE v. WORLEY K. HENRY**

**Appeal from the Criminal Court for Sullivan County**
**No. S46,442    Phyllis H. Miller, Judge**

_____

**No. E2003-02630-CCA-R3-CD - Filed September 29, 2004**

_____

On May 1, 2003, the defendant, Worley K. Henry, was convicted by a Sullivan County jury of theft of property valued at less than $500, possession of a Schedule IV controlled substance, and tampering with evidence. The trial court sentenced him to eleven months and twenty-nine days each for the theft and possession convictions and six years for the tampering with evidence conviction. The theft and evidence tampering sentences were to run concurrently to each other, but consecutively to the possession sentence. The defendant appealed his convictions for theft of property valued at less than $500 and tampering with evidence. He has alleged that the evidence is insufficient to support verdicts of guilty for these offenses. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Mark A. Skelton, Rogersville, Tennessee, for the appellant, Worley K. Henry.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; Greeley Wells, District Attorney General; and J. Lewis Combs, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Factual Background

_____

The victim, Tammy Henry, is the defendant's wife. The defendant and the victim had been married for about six years when the incident giving rise to these convictions occurred. At trial, the victim testified as to the events that led up to the defendant's arrest. She stated that the relationship

between the victim and the defendant had always been bad. She stated that they had many arguments and were having an argument on April 12, 2002 when the incident in question occurred.

The defendant and the victim had been separated for some time. According to Mrs. Henry, the defendant called her repeatedly, threatening her and trying to get her to come back to him. On April 12, 2002, the defendant continued his phone calls and threatened both the victim and her mother. The defendant was calling the victim on both her cell phone and the phone at her mother's house, where the victim was living at the time. Finally, the victim then agreed to meet the defendant. The defendant informed the victim of his location so she could meet him.

The victim met the defendant at the Dogwood Terrace Apartments in Kingsport. The defendant was standing in front of one of the apartments. The victim's seventeen-year-old son dropped her off to meet the defendant. When she got to the apartment, the defendant had an ax handle, and they began to argue about the defendant's harassment of her. The defendant asked the victim to stay and smoke marijuana with him and then take some pills. She refused the defendant's offer and told him that she did not want to be with him anymore. At this point, the defendant became abusive. The defendant began waving the ax handle at the victim. The defendant never hit the victim with the ax handle. He did, however, knock her down with his hands. Because of this fall, the victim broke her ankle.

The defendant ripped the victim's pocketbook off of her shoulder and jumped the fence behind the apartment building. The defendant also ripped a necklace from around the victim's neck. After he jumped over the fence, the defendant ran up into the woods. The police came and began to look for the defendant. The police finally found the defendant. They also found the victim's purse floating in the creek. The police returned the purse to the victim. The police also found the victim's necklace in the defendant's mouth. This was also returned to her.

The victim did not seek medical treatment that night. She did go the next day and eventually was diagnosed with a broken ankle. As a result, the victim wore a hard cast for five weeks and an air cast afterward.

On cross-examination, the victim admitted that she has a substance abuse problem. Although she denied drinking before the incident, she stated that at the time of the incident she was taking Xanax, and smoking marijuana, as well as taking lithium and blood pressure medication. The victim testified that she had taken these drugs within the twenty-four hours before going to see the defendant. She admitted that sometimes these drugs interfered with her memory and her ability to be rational. She stated that even though her marriage to the defendant had been a troubled one, she had not gotten a divorce. The victim stated she had not gotten a divorce because she has been working on paying for a divorce. She also admitted that her ankle had been bothering her before the night in question due an altercation with the defendant that occurred a few weeks before this night. However, her ankle hurt much worse after the incident at the center of this case.

At the time of the trial, the victim was in jail for third offense DUI. Both the victim and the defendant worked undercover for the drug task force. The victim's brother had been sent to prison on a drug offense. On cross-examination, the victim admitted that she was upset about her brother being sent to jail and that she blamed the defendant for this happening. However, the victim denied ever telling the defendant's mother that the victim was going to have the defendant sent to prison just like her brother. The victim admitted that she had seen the defendant when he visited her in jail and that she had sent him many letters and cards. The victim was furloughed from jail for twenty-five days when her mother died. During that time, the victim stayed with the defendant.

Officer Justin Quillen of the Kingsport Police also testified at the trial. Officer Quillen stated that on the evening of April, 12, 2002, he responded to a domestic call. He had heard of the defendant and the victim before but had never dealt with them. When he arrived at the Dogwood Terrace Apartments, he heard yelling and was directed to the rear of the apartments. When he arrived at the back of the building, he saw the victim standing inside the fence around the complex and the defendant standing outside the fence around the complex. The victim yelled, "Help, he's got my purse." Office Quillen saw the defendant stand up on the other side of the fence with a dark-colored bag that looked like a purse. The defendant began to run down a hill. Officer Quillen told the defendant to stop, but when he would not stop Officer Quillen jumped the fence and began to chase the defendant. When Officer Quillen reached the bottom of the hill he found the defendant lying face down on his stomach with his hands above his head. The officer straddled him and told him to put his hands behind his back. Officer Quillen had to physically force the defendant's hands behind his back because the defendant was not being coopertive. Another officer arrived and the officers patted down the defendant to check for weapons. The defendant was then placed in a police cruiser. Officer Quillen and another officer, Officer Lane, found the victim's purse in a stream about fifteen yards from where Officer Quillen caught the defendant. Officer Quillen went back to the apartment, and the victim told the officer that the defendant threatened her with an ax handle. Officer Quillen found the ax handle by retracing the defendant's path down the hill. After retrieving the purse and the ax handle, Officer Quillen began taking the victim's statement. While taking this statement, another officer showed Officer Quillen a necklace retrieved from the defendant's mouth. The victim identified the necklace as hers. The other officer handed Officer Quillen a blue pill and an orange pill retrieved from the floorboard of the police cruiser where the defendant was sitting. Officer Quillen returned the purse and the necklace to the victim. Officer Quillen stated that he did not see the three other men that had been mentioned earlier in the trial. The only people he saw were Shandra Wolfe, the victim and the defendant.

On cross-examination, Officer Quillen stated that the first time he saw the defendant was on the other side of the fence. Office Quillen never saw the defendant in possession of the ax handle but found it about twenty to forty yards from where the defendant began to run. The officer drew his gun when he got to the bottom of the hill, but the defendant was already down on the ground.

Agent Phillip Freeze is a forensic scientist with the Tennessee Bureau of Investigation ("TBI"). He specifically works with drug identification and analysis on a daily basis. Agent Freeze received two tablets, an orange tablet and a blue tablet from the officers involved in the defendant's

arrest. After analyzing the tablets, Agent Freeze concluded that the tablets contained Alprazolam, a Schedule IV controlled substance. Agent Freeze made a written report and sent it back to the Kingsport Police.

Officer David Johnson is an officer with the Kingsport Police Department. He heard a call on April 12, 2002 from Officers Quillen and Lane that they were in a foot pursuit. Officer Quillen radioed that he had the suspect in custody. Officer Johnson arrived on the scene. The officers patted down the defendant for weapons. Officer Johnson put the defendant in his police cruiser and drove the defendant back up to the apartments. While Officers Quillen and Lane searched for evidence, Officer Johnson stayed with the defendant in the police cruiser. Officer Johnson noticed the defendant bobbing his head like he was trying to reach something with his mouth. Officer Johnson asked the defendant what he was doing. The defendant told the officer he was trying to "reach that pill." Officer Johnson got out his flashlight and found a pill sitting on the defendant's shirt. Officer Johnson did not know how the pill had gotten there. The defendant would not tell Officer Johnson where he had originally obtained the pill but said he dropped them. The officer later found another pill on the floorboard. Officer Johnson also noticed that the defendant was attempting to talk while keeping something concealed under his tongue. Officer Johnson found a necklace in the defendant's mouth partly under his tongue and partly in his cheek. Officer Johnson gave both of the pills and the necklace to Officer Quillen.

The defendant also presented proof at trial. The first witness was his mother, Betty May Frieden. Ms. Frieden testified that the victim told her that she wished she had not pressed charges against the defendant. According to Ms. Frieden, the victim told her that she had messed up and was trying to get back at the defendant for an incident that happened a while ago. The defendant's mother said that the victim and the defendant have had several domestic problems because of the victim's mother and brother. The victim also told the defendant's mother that she went to see the defendant with "some boys" who had brought bats or sticks with them. However, they left when they saw the defendant because one of them knew the defendant. According to the story told to the defendant's mother, after the boys left, the victim began to beat the defendant with her purse, and the defendant grabbed the purse and threw it. On cross-examination, Ms. Frieden stated that the boys had been hiding in the bushes and she did not know if the defendant had seen the boys. Ms. Frieden stated that the victim told her this shortly after the incident. However, Ms. Frieden had not told anyone, including the police or the district attorney, this information prior to trial. Ms. Friend testified that the earlier incident which caused the victim to press the charges against the defendant involved the victim's brother. Apparently, the defendant took a package sent to the victim by her brother to the drug task force. In effect, the defendant turned in the victim's brother for drugs while the defendant was working as an informant. The defendant's mother also stated that the defendant and the victim both fight. The victim takes out orders of protection but always comes back to the defendant. In fact, when the victim was out on furlough she stayed with the defendant, who was living with Ms. Frieden at the time.

Shandra Wolfe, a witness to the incident, also testified for the defendant. She testified that she lives at Dogwood Terrace Apartments and saw the victim the night of April 12, 2002. She saw

three young boys and the victim outside of an apartment in the complex. The boys were yelling for the defendant to come outside of the apartment. The defendant did come out of the apartment and started swinging a large stick at the boys. The boys ran to their car and left. The victim continued to yell at the defendant. Ms. Wolfe then saw the defendant run toward the fence, and the victim yelled that the defendant hit her and took her purse.

The defendant was arrested the night of April 12, 2002. He was tried on April 30 and May 1, 2003. At the conclusion of proof, the jury found the defendant guilty of theft of property valued at less than $500, possession of a Schedule IV controlled substance, and tampering with evidence. The trial court sentenced the defendant to eleven months and twenty-nine days for both the theft and possession convictions and sentenced the defendant to six years for the tampering with evidence conviction. The theft and tampering with evidence convictions were run concurrently with each other and the possession conviction was to run consecutively to the other convictions. The jury also levied a fine of $750.00 for the possession conviction. The defendant appealed his convictions.

## ANALYSIS

The defendant's sole issue on appeal is that there was not sufficient evidence to support his convictions for tampering with evidence and theft of property valued at less than $500. When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

The defendant first argues that there was insufficient evidence to support his conviction for tampering with evidence. The elements of tampering with evidence is found at Tennessee Code Annotated section 39-16-503. Tennessee Code Annotated section 39-16-503 states, "(a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to: (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding . . . ." The

defendant argues that he could not be guilty of tampering with evidence because, the defendant "having possession of the necklace at the time of the arrest cannot fall within the definition of evidence tampering. The Appellant was still at the scene of the alleged criminal conduct. If the Appellant had wanted to destroy evidence, he could have simply dropped or thrown the necklace when pursued by the officer. However, the Appellant still had the necklace on his person, thereby avoiding the necessity of a search for same."

In State v. Katrina A. Callahan, No. E2002-00926-CCA-R3-CD, 2003 WL 1960267 (Tenn. Crim. App. at Knoxville, April 28, 2003), our Court analyzed Tennessee Code Annotated section 39-16-503. In that analysis, we stated that "an investigation was pending or in progress when the police officers arrived in their official capacity and began investigating . . . ." Katrina A. Callahan, No. E2002-00926-CCA-R3-CD, at * 9-10. The presence of the defendant at the scene of the criminal conduct does not negate the charges of tampering with evidence. In this case, the defendant was hiding the necklace in his mouth while the police were searching for evidence and investigating the charges made by the victim.

When analyzing the facts against the elements of the tampering with evidence statute, and the facts are taken in a light most-favorable to the State, there is sufficient evidence to convict the defendant for tampering with evidence. The defendant clearly knew that an investigation was pending because he had been chased by the police and placed in a police cruiser while handcuffed, so the officers could continue to search for evidence. The defendant clearly concealed evidence when he hid the victim's necklace underneath his tongue.

The defendant also argues that the victim, Tammy Henry was totally lacking in credibility, and points out several flaws in her testimony. As we noted above, the conviction of the defendant accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. The credibility of witnesses and weight to be given the evidence rest with the jury. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). We, as the appellate court, cannot second-guess the jury's decision on the credibility of witnesses. In addition, we point out that the defendant was originally charged with especially aggravated robbery. The jury was presented with robbery and the applicable lesser-included offenses. The jury convicted the defendant of the lesser-included offense of theft of property worth less than $500. It is very apparent that the jury carefully weighed the evidence with regard to the taking of the purse and the necklace and made a decision after careful deliberation.

The defendant also argues that the same fact was used to support more than one conviction. The defendant appears to argue that the taking and concealing of the necklace was the basis of both his conviction for tampering with evidence and his conviction for theft of property valued at less than $500. However, at the beginning of his argument in his brief, the defendant states that he was convicted for theft of property valued at less than $500 based upon his taking his wife' purse and personal belongings and that he was convicted on tampering with evidence based upon his concealing the necklace. Theft of property, found under Tennessee Code Annotated section 39-14-

103, requires an individual to "knowingly obtain[ ] or exercise control over the property without the owner's effective consent," with the intent to deprive the owner of the property. When the facts are viewed in a light most favorable to the State, it is obvious that the evidence supports the defendant's conviction. The defendant clearly grabbed the victim's purse and ran away with it. These actions clearly meet the elements set out for theft of property.

As stated above, the facts of this case amply support the defendant's convictions for theft of property valued at less than $500 and tampering with evidence. Therefore, we affirm the judgments of the trial court.

_____
JERRY L. SMITH, JUDGE