IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 28, 2006

## STATE OF TENNESSEE v. ROBERT EDWARD JOFFE

Appeal from the Criminal Court for Knox County
No. 74625   Richard R. Baumgartner, Judge

———————————

No. E2004-02926-CCA-R3-CD - Filed May 11, 2006

———————————

The appellant, Robert Edward Joffe, was indicted for assault, resisting arrest and two counts of disorderly conduct. After a jury trial, the appellant was convicted of assault, resisting arrest and one count of disorderly conduct. The trial court sentenced the appellant to eleven months and twenty-nine days for assault, six months for resisting arrest and thirty days for disorderly conduct. The trial court ordered the sentences to run concurrently and ordered that the appellant serve ninety days of the sentence in jail with the remainder of the sentence to be served on probation. The appellant appeals, arguing that the evidence was insufficient to justify the convictions and that the trial court erred in sentencing the appellant. Because the evidence was sufficient for a rational trier of fact to determine that the appellant committed the crimes as charged and because the trial court did not err in sentencing the appellant, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ALAN E. GLENN, and J. C. MCLIN, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Robert Edward Joffe.

Paul G. Summers, Attorney General and Reporter; David E. Coenen, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The appellant was indicted in April of 2002 by the Knox County Grand Jury for assault, resisting arrest and two counts of disorderly conduct stemming from an incident at Parent Place on March 26, 2001. At trial, the following evidence was presented.

Cathy Brewer, an officer with the Knox County Sheriff's Department, testified that on March 26, 2001, she got off work early and planned on seeing a movie with her friend, Lisa Joffe, the appellant's ex-wife. Officer Brewer met Ms. Joffe and her daughter at the Carmike-Millertown Cinema in East Knox County and Officer Brewer then drove Ms. Joffe and her daughter to Parent Place on Magnolia Avenue around 3:30 p.m. Parent Place is a "safe haven" where court-ordered visitation is supervised. Ms. Joffe's daughter was scheduled to have supervised visitation with the appellant at Parent Place that afternoon. Officer Brewer stated that, as they arrived at Parent Place, the child was "screaming and kicking" and appeared upset at the prospect of the visit. Officer Brewer maintained that she "sat in the car [parked out front] and waited for [Ms. Joffe] to come back so we could go catch our movie."

Officer Brewer testified that while she was waiting in the car, she saw the appellant come down the steps of Parent Place and start "pointing," "making a shooting motion with his . . . hand" at her. The appellant went around the side of the building at that time. Officer Brewer stated that she got out of her car, locked the doors and ran up the stairs to the front door of Parent Place. As she was banging on the front door she claimed that she heard "tires lock up." When she turned around she saw the appellant:

> Sliding up to the back of my vehicle, r[u]n out of the vehicle, r[u]n up to my car door, and yank the car door open. Of course, it was locked, and I was on the porch. . . . Then he trie[d] the back passenger door behind the driver seat, and then he [went] back to his car, I start banging on the door, and a gentlemen lets me in.
>
> I ran in to call KPD [the Knoxville Police Department] to ask for assistance, and I go back out and look, and he's writing down my tag number on my car, and so I go back inside, and I continue to watch from the window, and I stayed in that room until a KPD officer arrived.

Officer Brewer stated that she heard the appellant say the words "pay" and "bitch." Eventually, the appellant parked his truck across the street at the Kentucky Fried Chicken. According to Officer Brewer, the appellant then came into Parent Place and went "somewhere in the back of the house."

Officer Phillip Ray McClain of the Knoxville Police Department arrived on the scene. Officer Brewer explained to Officer McClain what had happened. According to Officer Brewer, Officer McClain then asked in a "real nice" tone to talk to the appellant. Officer Brewer stated that the appellant replied in a "smart aleck" tone that he was "staying right back here where I'm supposed

to be." Officer Brewer explained that Officer McClain asked the appellant to come out several times before he started back toward the back of the house. When Officer McClain started to grab the appellant's arm, Officer Brewer stated that the appellant "swung" at the officer and a struggle ensued. Officer Brewer saw Officer McClain reach for his pepper spray and yell "clear." At that point, Officer Brewer dropped to the floor to avoid the chemical agent. She saw the appellant strike Officer McClain and knock the canister of pepper spray into Officer McClain's eyes. Officer McClain was able to regain his composure, subdue the appellant and place him on the couch. Officer Brewer assisted in handcuffing the appellant because Officer McClain's eyes were "burning."

Officer Brewer also testified that she gave the same information to the internal affairs department of the Knoxville Police Department in response to a complaint filed by the appellant against Officer McClain. She explained that the appellant also attempted to sue her in federal court, but "they threw it out." Officer Brewer identified the appellant in the courtroom as the man she saw at Parent Place that day.

Officer Phillip Ray McClain testified that on March 26, 2001, he overheard a dispatch to Parent Place and responded to the call quickly because he was in the vicinity. He parked in front of Parent Place. At that time, he saw the appellant approach the porch stairs. Officer McClain walked up the stairs, was let into the building and asked to speak to Officer Brewer. He spoke with her, got the "gist" of the situation and saw the appellant standing at the "back of the room." At that time, Officer McClain asked the appellant to join him outside. Officer McClain explained:

> I wasn't yelling . . . . [O]bviously the first step is to just ask. He refused, and I started back there in a walk. At some point I asked him to . . . come outside again. He did at one point say something about the rules of Parent Place won't let me. I explained that I was a police officer and that he needed to come outside with me, that I understood, but those rules didn't work right now. I needed him to come outside with me, because I was trying to perform an investigation.
>
> At one point he said something like - well, at one point . . . his voice and demeanor escalated the situation, and I went to try to escort him out, and I sought the escort hold. . . .
>
> Just . . . basically you grab a hand and usually if somebody's giving you some trouble after you get their arm, they pretty much, nine out of ten times, will walk on out with you.

However, Officer McClain explained that the appellant "jerked away" so he had to try to subdue him. The appellant then "pushed" him and there were some "punches thrown" until Officer McClain was able to get the appellant in a headlock under his left arm. Officer McClain then explained that he went for his pepper spray when the appellant "put his fingertips into [Officer McClain's] eyeballs and proceeded to pull up and back." According to Officer McClain, the two continued to struggle and as he tried to spray the appellant with the pepper spray, the appellant knocked his wrist and the

spray went directly into Officer McClain's eyes. After another brief struggle, Officer McClain was able to handcuff the appellant with the help of Officer Brewer.

Another officer, Michael Jason Booker, arrived shortly thereafter and took the appellant outside. Officer McClain went outside to try to "get over the effects of the [pepper spray]." Both Officer McClain and the appellant were eventually transported to the hospital for treatment. After being released, Officer McClain took out arrest warrants against the appellant for assault, resisting arrest and disorderly conduct. Officer McClain also testified that the appellant lodged a complaint against him with internal affairs, alleging excessive force and violation of constitutional rights. He explained that the charges were determined to be unfounded and that he was exonerated. According to Officer McClain, the appellant admitted in a deposition that he hit, pushed and jerked away from Officer McClain.

Officer Booker testified that he could tell over the radio that Officer McClain was engaged in a struggle when he requested assistance at the scene. When he arrived at the scene, he noticed that Officer McClain had a significant amount of orange mist on his face, a side effect from the pepper spray. Officer Booker stated that the appellant had a minimal amount of orange mist on his face, but that the appellant claimed his shoulder was hurting.

Joyce Rysewyk, the program director of Parent Place, testified on behalf of the appellant. She explained that, at Parent Place, the noncustodial parent is instructed to arrive ten minutes early for the scheduled visitation and is instructed to leave ten minutes after the visit is over, while the custodial parent is instructed to arrive and leave directly at the time the visitation is scheduled to begin. Parent Place maintains this "strict rule" so that the noncustodial parent and custodial parent do not come into contact with one another.

According to Ms. Rysewyk, the appellant arrived at Parent Place as the noncustodial parent and Ms. Joffe arrived as the custodial parent with the child. Ms. Joffe did not leave immediately because "[the child] was having a little bit of a problem leaving her mom that night, and there was a little bit of a hesitation through all this." Ms. Rysewyk was informed that the appellant had parked his truck in the rear of the Parent Place building, a violation of the rules. At that time, she requested that the appellant move his truck to the front of the building. Ms. Rysewyk testified that she saw the appellant try to park his vehicle in front of the building, but that he eventually had to park across the street at Kentucky Fried Chicken because there was no room in front of the building. She did not see the appellant exit his truck prior to doing a u-turn and parking across the street.

At that time, the appellant came back into Parent Place. Ms. Rysewyk stated that a woman named "Cathy" followed him inside and used the phone to call 9-1-1. Soon thereafter, Officer McClain arrived and talked with Officer Brewer. Ms. Rysewyk confronted Officer McClain and asked him what was going on. She claimed that he replied, "I'm the law and you can't interfere with the law." Ms. Rysewyk stated that the officer was asking the appellant to come forward, but that the appellant replied that he could not come to the front because of the rules prohibiting him from having any contact with the custodial parent. After the appellant refused the officer's request, Ms. Rysewyk

-4-

testified that Officer McClain went up to the appellant and grabbed his arm. At that point, the appellant told the officer that he had just had surgery and that his shoulder was hurting. According to Ms. Rysewyk, the next thing she saw was both men on the floor struggling.

On cross-examination, Ms. Rysewyk admitted that the appellant had previously broken the rules of Parent Place and had actually been banned from the premises on previous occasions. Ms. Rysewyk stated that she did not see the appellant make shooting motions or point at Officer Brewer.

Following the presentation of the evidence, the jury convicted the appellant of assault, resisting arrest and one count of disorderly conduct. The jury found the appellant not guilty of disorderly conduct as charged in Count Four of the indictment.[1] Following a sentencing hearing, the appellant was sentenced by the trial court to eleven months and twenty-nine days for the assault, six months for resisting arrest and thirty days for disorderly conduct. The trial court ordered the sentences to run concurrently and further ordered that the appellant serve ninety days in jail and the balance of the sentence on probation.

The appellant filed a motion for new trial. The trial court denied the motion. Subsequently, the appellant filed a timely notice of appeal. On appeal, the following issues are presented for our review: (1) whether the evidence was sufficient to support the convictions; and (2) whether the trial court properly sentenced the appellant.

Analysis

The appellant challenges the sufficiency of the evidence. Specifically, the appellant argues that his actions did not prove "beyond a reasonable doubt that [he] had the required culpability to engage in assault, resisting arrest, and disorderly conduct. Rather, they more likely suggest that [he] was trying to avoid engagement with McClain and to extract himself from a physical conflict initiated by McClain." The State disagrees, contending that the appellant's argument is "completely without merit."

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn.

---

[1] Count Four of the indictment alleged that the appellant committed disorderly conduct towards Officer Brewer.

R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Moreover, questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are to be resolved by the trier of fact. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1991).

In the case herein, the appellant was convicted of disorderly conduct, assault and resisting arrest. Tennessee Code Annotated section 39-16-602 sets out the elements of resisting arrest. That statute states:

> It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at such officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

Tenn. Code Ann. § 39-16-602(a). Force is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(12). A person commits assault who "intentionally, knowingly or recklessly causes bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1). A person commits disorderly conduct "who, in a public place and with intent to cause public annoyance or alarm . . . [e]ngages in fighting or in violent or threatening behavior." Tenn. Code Ann. § 39-17-305(a)(1).

Viewed in a light most favorable to the State, the evidence shows that, on March 26, 2001, the appellant assaulted Officer McClain by sticking his fingers in the officer's eyes and causing the officer to spray pepper spray in his eyes, resisting Officer McClain's efforts to perform what he described as a Terry stop, and engaged in disorderly conduct by fighting with the officer and disrupting the operations at Parent Place. In particular, Officer McClain testified that "[a]s I went for pepper spray, [the appellant], with his right hand, went up over my shoulder in this area (indicates), put his fingertips into my eyeballs and proceeded to pull up and back." Officer McClain said that the appellant scratched his eyes and "it hurt." The evidence also shows that the appellant intentionally prevented Officer McClain's attempts to effect a stop, frisk, halt, arrest or search by using force against the officer. Officer McClain testified that as he tried to perform a Terry stop on the appellant, the appellant "jerked away" and "pushed" him off, eventually causing the officer to use the pepper spray, which the appellant deflected into Officer McClain's eyes. Finally, the appellant engaged in fighting and violent behavior inside Parent Place, which was full of children, parents and staff. Again, questions of witness credibility are left to the trier of fact. Pruett, 788 S.W.2d at 561. The jury weighed the evidence and found the appellant not guilty of the disorderly

conduct charge against Officer Brewer. However, we determine that a rational trier of fact could conclude that the appellant was guilty of the remaining charges of assault, resisting arrest and disorderly conduct. This issue does not merit relief.

Sentencing

The appellant contends that the trial court erred in sentencing him to a sentence of split-confinement of eleven months and twenty-nine days, with the appellant to serve ninety days in jail and the remainder of the sentence on supervised probation. Specifically, the appellant contends that he "had successfully completed a previous term of probation" without violation and that the trial court erroneously determined that he "continues to engage in conduct which is very risky." The State disagrees, arguing that the sentence is proper.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302, which provides in part that the trial court shall impose a specific sentence consistent with the purposes and principles of the 1989 Criminal Sentencing Reform Act. See Tenn. Code Ann. § 40-35-302(b). Misdemeanor sentencing is designed to provide the trial court with continuing jurisdiction and a great deal of flexibility. See State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998); State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim .App. 1997). One convicted of a misdemeanor, unlike one convicted of a felony, is not entitled to a presumptive sentence. See State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994).

In misdemeanor sentencing, a separate sentencing hearing is not mandatory, but the court is required to provide the defendant with a reasonable opportunity to be heard as to the length and manner of service of the sentence. Tenn. Code Ann. § 40-35-302(a). The trial court retains the authority to place the defendant on probation either immediately or after a time of periodic or continuous confinement. Tenn. Code Ann. § 40-35-302(e). In determining the percentage of the sentence to be served in actual confinement, the court must consider the principles of sentencing and the appropriate enhancement and mitigating factors, and the court must not impose such percentages arbitrarily. Tenn. Code Ann. § 40-35-302(d).

A defendant is eligible for alternative sentencing if the sentence actually imposed is 10 years or less. Tenn. Code Ann. § 40-35-303(a). While certain Class C, D and E felony offenders are entitled to a presumption in favor of probation, Tenn. Code Ann. § 40-35-102(6), the defendant is entitled to no such presumption regarding his misdemeanor sentence. See State v. Williams, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995). In determining whether to grant or deny probation, the trial court may consider the circumstances of the offense; the defendant's criminal record, background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant bears the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

In the case herein, the trial court conducted a sentencing hearing. At the hearing, the trial court heard testimony from Michelle Harris, a Knox County probation officer, who testified that the appellant was previously on probation on a reckless endangerment conviction. She was the appellant's probation officer for the "last couple of months of his probation." According to Officer Harris:

> When I was his probation officer the last couple of months, he informed me that he didn't plan to pay any of his court costs and probation fees. At that time I told him that if he didn't pay those court costs and probation fees, a violation of probation would be issued for his arrest. He told me that - let me make sure that I get it right - if a violation [of] probation warrant was issued for his arrest, to see what happens when I send the police to his house, that he would have an extra box of Hefty trash bags in his trunk. And when I asked him what that had to do with his probation, he said that he would be courteous and clean up the mess. When I asked what he meant by that, he said that I should figure it out. So I sent a memo to the Court and let the proper law enforcement authorities know.

Officer Harris testified that she interviewed the appellant for the presentence report, and that she did not think that the appellant would be a successful candidate for probation because she did not think that he would "comply with supervised probation." Officer Harris admitted that the appellant eventually paid his court costs and probation fees "[a]t the very end." Further, she stated that the appellant denied he was guilty of the offenses.

Lisa Joffe, the appellant's ex-wife, also testified at the sentencing hearing. She explained that there is an order of protection between her and the appellant. According to Ms. Joffe, "[t]he only time he's supposed to have contact with me is when it has to do with the visitation or he has [our daughter] during visitations. . . ." She claimed that the appellant violated the order of protection by calling her cell phone and calling her at home on a day he was not supposed to call. Ms. Joffe also testified that the appellant called her a "bitch" and other "not nice" names at the sentencing hearing.

In the presentencing report, the appellant submitted a long letter to the trial court wherein he did not take any responsibility for his actions or show any remorse for his violent behavior. In fact, he blamed his convictions on Ms. Joffe and Officer McClain. The appellant also made several accusations as to what happened, even claiming that the whole incident was a "setup". None of these allegations were supported by the trial testimony.

In sentencing the appellant to serve ninety days of the eleven (11) month and twenty-nine (29) day sentence in incarceration, the trial court commented:

> I've observed [the appellant] over a period of time here in the previous case when he was in this court and throughout this case, and it's clear to me that [the appellant] - this is one of those situations [where] there is no . . . ability to have a reasonable adult dissolution of a marriage, you know, and it may be both sides. I don't know. I'm not in that business, don't want to be in that business. But it's also clear to me that [the appellant] has some serious anger management problems, and that's gotten him in trouble. That's why he's here today.

> You know, the jury listened to the testimony in this case. They came to the conclusion that [the appellant] was guilty of these offenses. That's why we have the system that we have, and I think he was culpable for his conduct out there that day. Now, there may be two sides to every story, but I think that he was culpable for that conduct, and I think he continues to engage in conduct which is very risky, just like his comments here this morning when he comes into the courtroom and his previous threats to a probation officer.

> This is what I think is the appropriate resolution in this case. First of all, it's an A misdemeanor, a B misdemeanor, and a C misdemeanor. That's 11 months, 29 days; six months and 30 days. I'm going [to] impose those sentences, and I'm going to run them concurrent because they all arise out of the same event. So the sentence will be 11 months, 29 days.

> What I'm going to order is, I'm going to order split confinement. I'm going to order [the appellant] to do 90 days in custody followed by probation. . . . and when he's on probation, I want him to attend and complete an anger management course that's approved by the probation office.

After reviewing the evidence, we cannot conclude that the trial court exceeded the "wide latitude of flexibility" afforded in misdemeanor sentencing. Thus, we determine that ordering the appellant to serve ninety days of the effective eleven month and twenty-nine day sentence in incarceration is consistent with the principles of the sentencing act. This issue is without merit.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE