IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2006

## STATE OF TENNESSEE v. WILEY HAWTHORNE

**Appeal from the Criminal Court for Shelby County**
**No. 04-07592   Chris Craft, Judge**

---

**No. W2005-02320-CCA-R3-CD  - Filed February 2, 2007**

---

On November 2, 2004, the appellant, Wiley Hawthorne, was indicted on one count of attempted first degree murder and one count of felony reckless endangerment. On July 27, 2005, a jury found the appellant guilty on both counts. On August 26, 2005, the trial court sentenced the appellant to twenty-two years for attempting to commit first degree murder and eighteen months for reckless endangerment with a deadly weapon, the sentences to run concurrently. On September 9, 2005, the trial court denied the appellant's motion for a new trial. The appellant filed a notice of appeal. On appeal, the appellant contends that the evidence was insufficient to support his convictions on both counts of the indictment. Viewing the evidence in a light most favorable to the State, we conclude that the evidence was sufficient for a rational trier of fact to have found the accused guilty of both counts of the indictment beyond a reasonable doubt. Accordingly, we affirm the appellant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Tony N. Brayton, Assistant Public Defender, Memphis, Tennessee, for the appellant, Wiley Hawthorne.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General and Michelle Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On the night of July 15, 2004, the appellant, Wiley Hawthorne, forcibly entered the apartment occupied by his wife, Dora Hawthorne, and shot her in the right side of her head from a close

distance. The appellant then knelt over Mrs. Hawthorne and shot himself in the head. Both the appellant and Mrs. Hawthorne survived their injuries. Also in the apartment on the evening of July 15 were Mrs. Hawthorne's daughter, Aftan Jones, and Ms. Jones's two and one-half month old child.

The appellant and Mrs. Hawthorne had known each other for about twelve years. The couple had lived together for about eleven of those years, but had gotten married approximately three years prior to the incident in question. They have a son who was eleven years old in July 2005, though he was spending the summer with Mrs. Hawthorne's mother when the incident occurred. The appellant and his wife separated about two weeks before the shooting. Mrs. Hawthorne, upset over the appellant's gambling troubles, asked him to leave. At the time of the incident, the appellant no longer lived in the Hawthorne apartment.

Early in the evening of July 15, the appellant spent about two hours in the home of George Johnson, who lives in an apartment on the floor beneath the Hawthorne apartment. The appellant told Mr. Johnson that he was waiting for his wife because he needed to retrieve "some CDs and some tools" that he had left behind. Mr. Johnson testified that the appellant often looked out the door to see if his wife had arrived.

Before she returned home the night of July 15, Mrs. Hawthorne had driven a co-worker to the Wal-Mart in Southaven, Mississippi after work. Aftan Jones and her baby accompanied Mrs. Hawthorne on this trip. The three left Mrs. Hawthorne's co-worker's apartment at approximately 9:05 p.m. to return home. Ms. Jones testified that the three of them returned to the Hawthorne apartment at about 10:00 p.m.

When Mrs. Hawthorne returned, Mr. Johnson testified that the appellant left his apartment through the back door. The appellant then climbed the stairs to the Hawthorne apartment and knocked on the front door. Ms. Jones looked through the peephole and saw the appellant. The appellant told Ms. Jones that he had returned to retrieve his things, which Ms. Jones identified as "a tool box and the radio." Mrs. Hawthorne told Ms. Jones not to open the door.

When Ms. Jones told the appellant that she "wasn't going to open the door," the appellant responded "okay" and left. Ms. Jones testified that she "heard him leave down the stairs." The appellant then climbed up to the second floor balcony outside the Hawthorne apartment, a stunt that Ms. Jones had seen the appellant perform on another occasion. Both Mrs. Hawthorne and Ms. Jones heard several gunshots and the glass in their window shattered. Ms. Jones testified that the gunshots were "coming through the window." The appellant then threw a green diesel pump through the window and kicked out the remaining glass. Mrs. Hawthorne testified that she saw the appellant coming through the window and that she "could see that he was holding a gun."

Ms. Jones testified that the appellant grabbed Mrs. Hawthorne from behind and held the gun to Mrs. Hawthorne's head, saying "I told you it wasn't over." Mrs. Hawthorne also testified that the appellant pointed the gun at her head and "said that it's too late. It's too late and talking about you

trying to take my son away from me." Ms. Jones left the apartment and went to a neighbor's house to telephone the police.

The appellant and Mrs. Hawthorne struggled over the gun. The struggle began in the living room, but the appellant pulled Mrs. Hawthorne into the bedroom. At times during the struggle, Mrs. Hawthorne tried to convince the appellant to stop, saying "let's talk about it." The appellant responded, "ain't nothing to talk about." Mrs. Hawthorne testified that when the two were in the bedroom, there was a pause in the struggle. Standing face-to-face with Mrs. Hawthorne, the appellant raised his left arm, placed the gun on her right temple, and shot her above the right ear. The appellant then knelt over Mrs. Hawthorne and shot himself in the head. This bullet exited the appellant and cut the left side of Mrs. Hawthorne's face. At some point during the incident, Mrs. Hawthorne also suffered a broken ankle.

Mrs. Hawthorne and Ms. Jones both testified that they did not open the door when the appellant knocked on the evening of July 15, 2004 because Mrs. Hawthorne was frightened by an incident that occurred earlier that same week. On this occasion, the appellant entered the apartment while Mrs. Hawthorne, Ms. Jones, and Ms. Jones's baby were away, and he hid in the utility closet for the greater part of an entire day. Ms. Jones testified that she saw the appellant emerge from the closet. Mrs. Hawthorne was asleep on the couch, and awoke from a nap to see the appellant standing over her. When Mrs. Hawthorne asked how the appellant had entered the apartment, he responded that "he got his ways of getting in."

The appellant gathered some of his belongings and Mrs. Hawthorne drove him to his sister's home; Ms. Jones and her baby joined them. When the appellant exited the car, Ms. Jones testified that the appellant told Mrs. Hawthorne that "he had went to Mississippi to get a gun and he was going to kill her." Mrs. Hawthorne testified that the appellant told her "that this wasn't the last I was going to see of him." She also testified at trial that the appellant told her that he went to Mississippi to get a gun, but that she could not recall if he threatened to kill her. She gave the police a statement following this incident prior to the shooting. In this statement, she told Officer Charles Schuck that the appellant threatened to return to kill her. Officer Schuck confirmed this in his testimony at trial.

The appellant claims that he never visited Mr. Johnson's apartment the night of the shooting. He testified that he purchased the revolver in Memphis about a month before the shooting, after arriving home late one night to find the back door ajar.

According to the appellant, he never knocked on the front door the night of July 15. The appellant testified that on the night of the shooting he climbed to the balcony outside the Hawthorne apartment, but that he did not break the window beside the back door. Rather, he claims that he broke a pane of glass on the backdoor so that he could reach inside to unlock it. In his testimony, he said that he entered through this door, and he could not explain why the window was broken. The photos of the crime scene, however, show a chair blocking the back door of the apartment. The appellant claims that this chair was not there when he entered through the door.

The appellant testified that he decided to enter via the balcony "to spy to see was there any other guy in the house." He also testified that he brought the revolver with him that evening in case another man was in the apartment. The appellant admitted that he had the gun in his left hand as he entered the apartment, but he denied that he and Mrs. Hawthorne ever struggled. To the contrary, the appellant testified, "I had my arm around my wife [sic] waist, trying to kiss her and hold her next to me and talking to her" about their relationship difficulties.

The appellant's version of the shooting is that Mrs. Hawthorne's hair had fallen into her face and he tried to brush it away so that he could kiss her. When he raised his left arm, with the gun in his left hand, Mrs. Hawthorne hit his arm, causing the gun to discharge about one inch away from her head. The appellant claims that this occurred in the living room of the apartment, where he then knelt over Mrs. Hawthorne and shot himself.

Regarding the event earlier during the week of the shooting, the appellant admits that he hid in the apartment's utility closet but claims that he was there "trying to find out what was, you know, my wife was saying to other peoples about my concern and everything." He denied having threatened his wife after she took him to his sister's home that evening.

## II. Analysis

The appellant contends that the evidence was insufficient to support his conviction for both attempted first degree premeditated murder and felony reckless endangerment with a deadly weapon.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded form reweighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Further, questions concerning the credibility of witnesses and the weight and value to be given to evidence, as well as all factual

issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. <u>State v. Pruett</u>, 788 S.W.2d 559, 561 (Tenn. 1990).

## 1. Attempted First Degree Premeditated Murder

Under Tennessee statute, first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). The statute further provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). An action is "intentional . . . when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). Tennessee statute defines criminal attempt as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> > (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> > (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the persons' part; or
> > (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101.

Viewing the facts in a light most favorable to the State, a rational juror could conclude beyond a reasonable doubt that the appellant intended to kill Mrs. Hawthorne the night of July 15, 2004. After threatening to kill Mrs. Hawthorne earlier during the week of the shooting, the appellant

returned to her apartment complex with a handgun. He waited for Mrs. Hawthorne to return home, and when he was unable to enter through the front door, he climbed to the balcony and forced his way into the apartment, all the while carrying the gun in his hand. After he entered through the window, the appellant pointed the gun at Mrs. Hawthorne's head. After the two stopped struggling over the gun, the appellant raised the gun and fired one shot into the right side of Mrs. Hawthorne's head from about one inch away.

Based on these facts, a rational juror could clearly find that the appellant intended to kill Mrs. Hawthorne on the night of July 15, 2004, and that the action was premeditated. Furthermore, that same rational juror could conclude beyond a reasonable doubt that by firing the gun into her head, the appellant acted with the intent to kill Mrs. Hawthorne. At the very least, the shooting was a substantial step toward the commission of the offense. Therefore, the evidence was sufficient for a rational juror to conclude beyond a reasonable doubt that the appellant was guilty of attempted first degree murder.

## 2. Felony Reckless Endangerment

Under Tennessee's reckless endangerment statute, "[a] person commits an offense who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). When reckless endangerment is committed with a deadly weapon, it is a Class E felony. Tenn. Code Ann. § 39-13-103(b). A person acts recklessly "when the person is aware of but consciously disregards a substantial and unjustifiable risk." Tenn. Code Ann. § 39-11-302(c). That "risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Id.

Viewing the facts in the light most favorable to the State, a rational juror could conclude beyond a reasonable doubt that the appellant's actions the night of July 15, 2004 placed Ms. Jones in imminent danger of death of serious bodily injury, and that he used a deadly weapon in commission of the offense. Because the appellant spoke with Ms. Jones when he knocked on the front door, he knew that she was in the Hawthorne apartment when he climbed to the balcony and discharged his revolver through the back window and into the apartment. A rational juror could conclude beyond a reasonable doubt that the appellant's action—firing a gun into the occupied apartment—was reckless; i.e., the appellant consciously disregarded a substantial and unjustifiable risk that his actions would place Ms. Jones at imminent risk of death or serious bodily injury. Therefore, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the appellant was guilty of felony recklessly endangerment.

### III. Conclusion

Because the evidence was sufficient for a rational trier of fact to find the accused guilty of every element of both offenses beyond a reasonable doubt, we affirm his convictions.

_____
JERRY L. SMITH, JUDGE